The ECOLOGY CENTER OF LOUISI-ANA, INC., the Orleans Audubon Society, Inc., the Sierra Club, and the Louisiana Shrimp Association, Inc., Plaintiffs-Appellants,

v.

William T. COLEMAN, Secretary of the United States Department of Transportation, et al., etc., Defendants-Appellees.

No. 74–3907.

United States Court of Appeals, Fifth Circuit.

July 11, 1975.

J. Arthur Smith, III, Baton Rouge, La., for plaintiffs-appellants.

Michael Osborne, New Orleans, La., for Sierra Club.

John M. Holaham, New Orleans, La., for La. Shrimp Assoc.

Norman L. Sisson, Sharon P. Frazier, Robert J. Jones, Baton Rouge, La., for W. T. Taylor & C. L. Manuel.

John Schupp, Asst. U. S. Atty., New Orleans, La., Kathryn A. Oberly, Edmund B. Clark, Attys., Dept. of Justice, Edward V. A. Kussy, Fed. Hwy. Adm., U. S. Dept. of Trans., Walter H. Johnson, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for defendants-appellees.

Alvin Rudy Eason, Gretna, La., for other interested parties.

Before GOLDBERG and RONEY, Circuit Judges, and LYNNE, District Judge.

GOLDBERG, Circuit Judge:

This case drives us into the bayous of environmental law, the estuaries of the

equitable notion of laches, and the swamps of administrative procedure. We are called upon to decide whether plaintiffs have correctly navigated their legal barge through our procedural channels such that their case should have been heard in district court. The trial court was unimpressed with the plaintiffs' chart reading and located them on the sandbar of summary judgment. We take a different view and reverse the judgment below in several particulars.

This lawsuit stems from the defendants' plan to build a highway. The highway, designated I–410 would start west of New Orleans and branch off from U.S. Interstate I–10. It would then loop south and connect with U.S. 90 around Boutte, Louisiana. The loop would continue around, now heading in an easterly direction below New Orleans and would finally reconnect with I–10 east of New Orleans, in effect creating a by-pass around the city. The highway is to be built jointly by Louisiana and the Federal Highway Authority. Before building a federally aided highway planners are charged by the National Environmental Protection Act with assessing the effect such a development would have on the ecology of the area by issuing an Environmental Impact Statement. After some internal governmental debate the defendants to this suit decided to issue two impact statements, covering what they considered the differing environmental effects of different parts of the planned road. They decided to issue an EIS on what is termed "Section I" of the proposed highway, which covers the road from the moment it branches off of I–10 west of New Orleans to the point where it connects with U.S. 90 near Boutte. Section II would cover the road from the moment it leaves Boutte until it refinds I–10 east of New Orleans.

An impact statement for proposed Section I was circulated in draft from about May 7, 1971, and a public location hearing—to determine the general area in which the highway would be constructed—was held on July 1, 1971. The plaintiffs did not take part in that hearing. The EIS was approved by the federal government on March 9, 1972. A design public hearing—to determine the exact placement and characteristics of the highway—was held on March 1, 1973; plaintiffs appeared at this hearing.[1] Plaintiffs brought this suit on March 29, 1974.

Plaintiffs alleged in their complaint that a variety of illegalities were committed in the formulation of the Environmental Impact Statement accompanying Section I. Plaintiffs charged that the federal government improperly delegated the drafting of the Environmental Impact Statement to the State of Louisiana; that the EIS itself was deficient in that it did not correctly assess the environmental impact of the project and alternatives to the project; and that the EIS indicated an improper segmentation into two projects of what is really a unitary project, since it covered only what had been designated as Section I.

The district court held a hearing on July 3, 1974 and granted summary judgment to defendants in an order entered July 6, 1974.[2] The four conclusions of law stated that the highway project was not improperly segmented; that there was no improper delegation to the state of responsibility for the Impact Statement, since the Federal Highway Administration independently reviewed the statement; that "the plaintiffs failed to exhaust their administrative remedies with respect to Section I for failure to comment on the Draft Environmental Impact Statement and for failure to ap-

1. Three other public hearings, on May 3, 1972, May 30, 1972 and October 2, 1973 were held on Section II of the highway. Plaintiffs attended each of these hearings.

2. Though the district court said that it was granting defendants' motion to dismiss, it held evidentiary hearings, based its decision on what it termed "uncontroverted material facts", and entered a final judgment. Thus, in effect, the court granted summary judgment. See Fed.R.Civ.P. 12(b).

pear at the location public hearing of July 1, 1971"; and that "as plaintiffs waited more than two years in filing this suit from the date that the Final Environmental Impact Statement for Section I was approved, and considering the large expenditure of public funds with respect to this Section, the Court finds that plaintiffs are guilty [of] laches with regard to Section I."

We conclude that the district court properly found against plaintiffs on the claim of improper delegation. However, we believe that the district court erred in dismissing the remaining causes of action in this suit and therefore reverse its judgment in part.

## I. Preliminary Issues

■ The law relating to our review of a grant of summary judgment is clear. We join the monotony of precedential pronouncement that summary judgment can be granted only when there is no genuine issue as to any material fact and where the moving party is entitled to a judgment as a matter of law. If there is a real factual dispute between the parties, relevant to a legal claim, then they must be afforded a trial. Fed.R.Civ.P. 56(c); McPhee v. Oliver Tyrone Corp., 5 Cir. 1974, 489 F.2d 718; Keating v. Jones Development of Missouri, Inc., 5 Cir. 1968, 398 F.2d 1011. In order to determine these matters we look at the pleadings, depositions, answers to interrogatories, admissions on file and any affidavits. Fed.R.Civ.P. 56(c); Sherman v. Hallbauer, 5 Cir. 1972, 455 F.2d 1236.

It is on this basis that we must review the facts and legal issues which led the district court to believe that both the failure of administrative exhaustion and the presence of laches barred substantive consideration of plaintiffs' claims, and that no material issue of fact or question of law revolved around the segmentation of the project and the delegation of environmental planning to the state.

## A. Administrative Exhaustion

■ The district court found as a matter of fact that a draft EIS was circulated on or about May 7, 1971 and that it was made available to the public according to law. The judge also stated that a Location Public Hearing for Section I was held on July 1, 1971 and that it was publicized according to law. He found that none of the plaintiffs either appeared at the location public hearing or submitted written comments on the draft EIS. On this basis he concluded that:

> The plaintiffs failed to exhaust their administrative remedies with respect to Section I for failure to comment on the Draft Environmental Impact Statement and for failure to appear at the location public hearing of July 1, 1971. [citations omitted].

We believe that the district court was in error in its conclusions, because there remains a factual controversy as to whether plaintiffs were indeed properly notified of the administrative remedies which they were thought to flaunt.

At the time that the draft EIS was circulated and the location public hearing held, the procedures which were to guide those holding hearings pursuant to grants from the Federal Highway Administration [FHWA] were set out in 23 C.F.R. Chap. 1, App. A. ¶ 8.a.(2), which provided in part:

> In addition to publishing a formal notice of public hearing, the State highway department shall mail copies of the notice to appropriate news media, . . . The State highway department shall also mail copies to other federal agencies, and local public officials, public advisory groups and agencies who have requested notice of hearing and *other groups or agencies who by nature of their function, interest, or responsibility the highway department knows or believes might be interested in or affected by the proposal.*[3] (Emphasis supplied).

3. The current formulation of this policy is to be found in 23 C.F.R. § 790.7(a)(2) which reads as follows:

> In addition to publishing a formal notice of public hearing, the State highway department shall mail copies of the notice to other

One plaintiff, Delta Chapter of the Sierra Club, submitted affidavits and supporting letters to the district court in which it claimed to have written to the Louisiana State Department of Highways on May 13 and 15, 1970, prior to the release of the EIS, about its concern for the environmental impact of a highway through the area that proposed I–410 would traverse. These letters, of course, reflected the Club's interest in the project. Nonetheless, the current chairperson attested that Delta Chapter was not advised of the location hearings later held:

> To the best of my knowledge the Louisiana Department of Highways did not attempt to, nor did it actually provide the Sierra Club with any information concerning the draft Environmental Impact Statement for the I–410 section from Interstate 10 (West) to Boutte or the Location Public Hearing held on July 1, 1971 despite the previously exhibited concern.

According to Federal Highway Administration regulations, the State should have responded to these letters by giving the Club specific notice of any hearing at which the location of a project or its environmental effects would be discussed. 23 C.F.R. Chap. 1, App. A, ¶¶ 3., 4., 6.a., and 8.a.(2) (1971). In the State's "Answer to Plaintiffs' Request for Admissions of Fact and Genuineness of Documents by State Defendants," however, the State claimed:

> Notices of *all* public hearings were published in the local newspapers in

accordance with FHWA PPM 20–8. Notices were also mailed to all agencies and known interested private groups *at the time* of each hearing, . . . [italics original]

■ These dichotomous positions of plaintiff and defendants clearly create "genuine issues as to a material fact," inappropriate for summary judgment. If the Highway Department violated the regulations which the FHWA laid down for notification of interested parties concerning hearings which afford opportunity for comment on the slated issues, then those parties cannot be held to have failed to exhaust their administrative remedies when they do not attend the hearing. It is impossible to tell from the pre-trial documents whether specific notice was sent to interested private parties or not and, thus, whether the concept of administrative exhaustion even applies or not.

There is no indication that any other organization directly communicated its interest to the Highway Department before the release of the draft EIS.[4] But, on remand, the district court should ascertain whether the functions and interests of these other groups were such that the Department should have believed that they might be interested in the proposed EIS and location hearing. The notoriety of these groups and of their environmental interests should be considered in this regard.[5]

■ Moreover, we note that the doctrine of administrative exhaustion is not

---

Federal agencies, and local public officials, public advisory groups and agencies who have requested notice of hearing and other groups or agencies who, by nature of their function, interest, or responsibility the highway department knows or believes might be interested in or affected by the proposal.

4. An affidavit and supporting evidence from the Orleans Audubon Society show that one of its members did communicate with the Highway Department in 1970. However, his letter indicates no connection with the Audubon Society, so the Highway Department cannot be charged with knowing the affiliation of this letter-writer.

5. As the district court noted, none of the plaintiff organizations submitted comments on the draft Environmental Impact Statement. However, at the time of its promulgation, the Federal Highway Authority regulations called for commentary on the "social, economic *or environmental impact*" of a project to be delivered at the aforementioned public hearing. Thus, if the Highway Department did not properly notify plaintiffs of this hearing, plaintiffs can no more be barred for not commenting on the draft EIS than they can for missing the meeting in the first place.

a strict jurisdictional matter but a flexible concept tailored to the administrative statutes and circumstances. As the Supreme Court noted in McKart v. United States, 1969, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194:

> The doctrine [of administrative exhaustion] is applied in a number of different situations and is, like most judicial doctrines, subject to numerous exceptions. Application of the doctrine to specific cases requires an understanding of its purposes and of the particular administrative scheme involved.

395 U.S. at 193, 89 S.Ct. at 1662, 23 L.Ed.2d at 203 [footnote omitted]. See also Damico v. California, 1967, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647; Dent v. St. Louis-San Francisco Railway Co., 5 Cir. 1969, 406 F.2d 399.

■ Thus even if the district court does find a failure by one or more of the plaintiffs to exhaust administrative remedies, that finding does not dictate summary judgment for the defendants. It does dictate a balancing of interests in which the previous availability of a corrective administrative procedure weighs heavily. The criteria used in the balancing process were explicated in McKart, supra, and they include the following factors: 1) how harsh is the penalty that plaintiff will suffer if barred from asserting his claims in court; 2) even if the penalty is not overwhelmingly harsh, will allowing a by-pass of administrative procedure seriously impair the ability of the agency to perform its functions; 3) does the issue upon which the decision turns involve matters of particular agency expertise; 4) would judicial review be significantly aided by an additional administrative decision, through allowing the agency to make a factual record, apply its expertise or exercise its discretion; 5) how likely is it that the judiciary will be overburdened with suits stemming from the same administrative failure when such suits might have been resolved through the administrative process; and 6) how significant is the role of administrative autonomy—the notion that the courts should not usurp powers and duties entrusted to the agency, and the related notion that "the agency [ought to] be given a chance to discover and correct its own errors"?

The McKart case involved the issue of whether a particular defense to a criminal charge could be raised. In the present case, we are faced with a civil issue. But this Court has applied the McKart criteria in civil cases as well to determine whether the administrative exhaustion doctrine should be invoked. In Penn v. Schlesinger, 5 Cir. en banc 1974, 497 F.2d 970, rev'g 490 F.2d 700, an association seeking to represent black federal employees brought a court action before exhausting its administrative remedies. The en banc court decided that the plaintiffs had to exhaust these remedies, noting that it did so "for the reasons set out in the dissenting opinion" of Judge Godbold in the panel opinion. Judge Godbold's opinion in panel went through a careful analysis of the applicability of the administrative exhaustion doctrine, according to the McKart criteria, in suggesting that the doctrine should apply in that particular case.[6]

The Second Circuit has also decided that the failure to exhaust administra-

---

**6.** This Court has considered the applicability of the exhaustion doctrine in other contexts. In Hodges v. Callaway, 5 Cir. 1974, 499 F.2d 417, we considered the case of a plaintiff subject to an unfavorable military discharge. In that situation administrative remedies remained open to the plaintiff even if the court would not hear his case. We decided that the doctrine of administrative exhaustion should apply in this context both because the question of military discharges called for a great deal of agency discretion and because the continued availability of administrative remedies made application of the doctrine considerably less harsh. The application of the balancing test to a situation in which administrative remedies remain available was not addressed in McKart. In Sims v. Fox, 5 Cir. en banc 1974, 505 F.2d 857, rev'g 492 F.2d 1088, this Court decided that plaintiff did not have a cause of action and therefore did not discuss the exhaustion problem presented; however, the panel opinion had decided that exhaustion was not required in that situation.

tive remedies did not in itself bar a civil litigant from the courts. Diapulse Corp. v. Food and Drug Admin. of Dept. of Health, Educ. and Welfare, 2 Cir. 1974, 500 F.2d 75. However, in *Diapulse*, the Court went on to apply the *McKart* criteria on its own to conclude that the plaintiff could remain in court. On the record before us, we instead send the present case back to the district court for its initial determination. The various pleadings and other documents available to us simply do not allow for the weighing of factors called for in *McKart*. It is for the district court to develop this record, and make a primary conclusion on the legal sufficiency of the evidence.

In sum, we do not believe that the district court could have properly come to the conclusion that plaintiffs had not exhausted administrative remedies on the basis of the facts before it. In addition, the failure to exhaust would not, in itself, have necessarily dictated dismissal of the action. Should it develop on an evidentiary record that in fact, administrative remedies were ignored without cause, the district court should proceed upon a *McKart* balancing.

### B. *Laches*

The district court found that right of way acquisitions had cost over $1,000,000 for the first segment of the project and that plaintiffs had waited more than two years after the date that the Final EIS was approved before filing suit. He therefore concluded that the plaintiffs were guilty of laches with regard to that section and thus that plaintiffs were barred from asserting their causes of action with regard to Section I on this basis too.

▬▬▬ The doctrine of laches is applicable to suits brought under the National Environmental Protection Act. *See* Clark v. Volpe, E.D.La.1972, 342 F.Supp. 1324, aff'd 5 Cir. 1972, 461 F.2d 1266, 1324.[7] There are three independent criteria which must be met before the equitable doctrine of laches can be applied. The defendant must show a delay in asserting a right or claim, that the delay was not excusable and that there was undue prejudice to the party against whom the claim is asserted. Watz v. Zapata Off-Shore Co., 5 Cir. 1974, 500 F.2d 628.[8] We do not believe that prejudice to the defendants here has been es-

---

7. Previous applications of the doctrine have generally involved the issue of delay in bringing suit where no EIS was filed at all. *See,* Clark v. Volpe *supra;* Named Individual Members of San Antonio Conservation Society v. Texas Highway Dept., 5 Cir. 1971, 446 F.2d 1013 n. 23; Arlington Coalition on Transportation v. Volpe, 4 Cir. 1972, 458 F.2d 1323. But the doctrine is just as applicable to this second generation of environmental suits, challenging the sufficiency of an EIS. The likelihood and magnitude of prejudice to the defendant is the same, since that prejudice depends on the nature of the project planned, and the projects here are of the same genre as those contested in the first generation of suits. Delay, of course, remains a volitional characteristic of the plaintiff.

8. It has been said that the defense of laches is addressed largely to the discretion of the district court. Such a notion has been applied to uphold the district court in cases in which the trial court refused to apply the doctrine. *See* Burnett v. New York Cent. Ry. Co., 1965, 380 U.S. 424, 85 S.Ct. 1050, 13 L.Ed.2d 941; Watz v. Zapata Off-Shore Co., *supra.* That discretion is, of course, confined by recognizable

standards and does not in itself give rise to a presumption of legal correctness. In Gardner v. Panama Ry., 1951, 342 U.S. 29, 72 S.Ct. 12, 96 L.Ed. 31, where the discretionary notion in regard to laches makes its debut in the form of dicta, the Court cautioned:

> Though the existence of laches is a question primarily addressed to the discretion of the trial court, the matter should not be determined merely by reference to and a mechanical application of the statute of limitations. The equities of the parties must, be considered as well. Where there has been no inexcusable delay in seeking a remedy and where no prejudice to the defendant has ensued from the mere passage of time, there should be no bar to relief.

342 U.S. at 31, 72 S.Ct. at 13, 96 L.Ed. at 36. There, the Court reversed an application of the laches doctrine merely by reviewing the facts and without regard to any presumption. This Court has especially noted that caution is called for before laches is applied on summary judgment where the facts have only been developed in affidavits and allegations. *See* Powell v. City of Key West, 5 Cir. 1970, 434 F.2d 1075, 1080.

tablished on this record and therefore do not believe that the equitable doctrine of laches should apply.[9]

█ In assessing the nature of the asserted prejudice in the present case we must do two things. First, we must weigh the actual expenditures of the agencies which are the defendants in this case. This much is true of any case where the doctrine of laches is considered. But a second step is added in this case because the prejudice to the defendant lies not merely in its actual expenditures or even in its claimed detriment, but rather in what Congress defines as the prejudice. The defendant agency in this case serves as a proxy for "the public interest," in that it is Congressionally charged with affirmatively considering both the transportational needs and the environmental needs of the people in an area. The prejudice is determined by extrapolating from the Congressional directive a set of criteria which the *agency* should use to determine what its interests are. Any agency action must be evaluated not only in terms of the cost of slowing transportation system development and funds committed in that pursuit, but also, in the cost of unnecessary environmental harm. In the absence of specific legislative policy, the agency can claim what harm it believes it has suffered, but when Congress charges an agency to make specific calculations in assessing what action is in the agency's interest, the Courts may not give that agency an unintended discretion by measuring actions by a different, agency-chosen, calculus.

The Fourth Circuit stated this proposition somewhat differently, but to the same effect, in Arlington Coalition on Transportation v. Volpe, 4 Cir. 1972, 458 F.2d 1323, where $28,600,000 had already been expended:

. . . [W]e decline to invoke laches against appellants because of the public interest status accorded ecology preservation by the Congress. We believe that Arlington I–66 has not progressed to the point where the costs of altering or abandoning the proposed route would certainly outweigh the benefits that might accrue therefrom to the general public. In their reconsideration of the proposed route, the Secretary of Transportation and the Commissioner of the Virginia Department of Highways may decide, of course, that the costs do outweigh the benefits. If the opposite conclusion is a reasonable possibility, however, as it is here, the congressional declaration of policy in the relevant statutes of the importance of the benefits that might accrue demands that the merits of the question be considered by the appropriate agencies.

458 F.2d 1330 (emphasis deleted).

In Clark v. Volpe, E.D.La.1972, 342 F.Supp. 1324, aff'd 5 Cir. 1972, 461 F.2d 1266, a form of this analysis was used where the Court did apply the laches doctrine. The defendants in that case showed a high level of prejudice to the public fisc, prejudice to transportation goals *and* that no environmental benefits would be enjoyed by stopping the project, such that the other costs incurred would be balanced out.

The *Clark* district court found that the state had acquired a strip of park land for $1,240,000; and in addition that obvious and extensive demolition of buildings and commencement of highway construction had taken place outside the park and that the highway was heading inexorably toward the park from both the East and the West; that highway construction work had started some several months earlier—a segment of land had been graded, sub-surface drainage installed, a roadway relocated, pilings and footings erected; and that, according to defendant's estimate, 25–30% of the total work had been completed. In sum, there had been both a tremendous expenditure

9. We therefore need not decide whether the measure of delay should commence at the date the Final EIS is issued or whether it awaits the final approval of the project by the Department of Transportation in its Plans, Specifications and Estimates (P.S. & E.) approval.

of funds and significant progress towards achieving transportation goals in the area.

But the court went on to evaluate the environmental effects of stopping the project, since those benefits must be charged to the defendant. It noted "the statutes are designed to promote inquiry as to ecological impact *before* an area of natural beauty is affected" and thus concluded "had plaintiffs not procrastinated while bulldozers desolated a strip of land through the park and while vast sums of public money were expended, then they might have proceeded *without prejudice to anyone.*" 342 F.Supp. 1324 at 1330 (*some* emphasis added).

▋ The defendants here have shown far less prejudice either to the public treasury or to transportation goals. The district court found that *bids* for $39,000,000 worth of work had been let out but did not explain to what extent this factor prejudiced the defendants. The district court found that defendants had spent about $1,000,000 to acquire rights of way for a project which plaintiffs allege will cost around $667,000,000.[10]

There is no finding by the district court as to the particular urgency of the completion of I–410, or as to what delays would inhere in stopping the project until the present suit is resolved, or as to what effect stopping the project now would have on the final completion of the road.

Finally, and unlike the case in *Clark,* there may be great environmental benefits to be had here. Plaintiffs allege that the estuaries that would be affected by the highway are among the most productive ecosystems on earth. They allege that Louisiana ranks first in commercial fisheries in this country and that 67% of that catch comes from the areas lying close to the site of the proposed highway. Certain areas of the region provide the nursery grounds for the spawning of various gilled and hard-shell species, they claim. They contend that the vegetation produced in this area also feeds various local animals, providing a boon to hunters. Plaintiffs also note the extensive birdlife indigenous to the area, illuminating us with the assertion that John James Audubon "painted more birds for *The Birds of America* in Louisiana than in any other place." In all, the assertions give a picture of a lush area productive of multitudinous flora and fauna. And, plaintiffs allege a variety of "irreparable injuries" to this area will stem from the building of I–410. This action was brought before "the area of natural beauty is affected." The bulldozers have not yet significantly affected the natural ecology of the area and thus have not depreciated any of the environmental benefits which may be had by altering the project. An environmental reconsideration here could capture the full benefit statutorily protected by the National Environmental Protection Act.

We thus do not believe that the defendants have established prejudice beyond a genuine question to the accomplishment of their statutorily charged duties. Consequently, the district court clearly erred in concluding on this summary judgment that plaintiffs were barred by laches.[11]

## II. *The Causes of Action*

Having decided that neither the doctrine of administrative exhaustion nor

10. This $1,000,000 cost is itself mitigated by two factors. First, of course, even if the project were to be stopped, the rights of way would be a saleable asset of at least some value. Second, and more importantly, we note the possibility that the acquisition will be utilized as planned. An environmental reconsideration will by no means dictate a change in plans. Even if certain aspects of the project are changed, a road through the same places may still proceed, since many changes could involve only project design or construction and not placement.

11. Other courts have decided that laches should not apply, even where there had been great financial expenditures, in these environmental cases, though they have not disposed of the issue on the exact grounds enunciated here. *See, e. g.,* Jones v. Lynn, 1 Cir. 1973, 477 F.2d 885 ($12,000,000 expended); Environmental Defense Fund v. T. V. A., 6 Cir. 1972, 468 F.2d 1164 ($29,000,000 expended).

that of laches bars the bringing of this action, we turn to the substantive complaints to see if they conjure genuine issues of material fact on matters of legal cognizance.

Our first step is to reinstate to the district court docket those causes of action which have not been briefed here and on which the trial judge did not specifically reach the merits but evidently barred in his general application of the aforementioned equitable doctrines. Causes of Action two through five and eight deal with the alleged inadequacy of the Environmental Impact Statement to conform to various provisions of the National Environmental Protection Act. The district judge made no findings as to these causes and so they are reinstated. The Seventh Cause of Action alleges that building highway I–410 would violate provisions of the Fish and Wildlife Coordination Act, 16 U.S.C. §§ 662 and 663. No finding was made as to this allegation, and it too is reinstated to the district court docket. Causes of Action Ten through Twelve maintain that building the highway would violate various provisions of the Federal Aid Highway Act, 23 U.S.C. §§ 103, 134, 138 and the Department of Transportation Act, 49 U.S.C. § 1653(f). The trial court made no finding as to this contention and we send this cause back to its docket. The Thirteenth Cause of Action alleges that building I–410 would violate provisions of the Clean Air Act. Again, as the district court made no finding as to the substantiality of this claim, it too is remanded to the court below.

The district court did make specific findings and conclusions on the merits of some of the causes and we must examine those findings in light of the summary judgment criteria to see whether those findings and conclusions are sustainable.

■ The First Cause of Action maintains that the project was improperly segmented into two sections when in fact it is one project for environmental purposes. Such segmentation is alleged

to violate 42 U.S.C. § 4332, and, more specifically, Section 6 of FHWA's Policy and Procedure Memorandum 90–1, which deals with preparation of the EIS and reads:

> The highway section included in an environmental statement should be long as practicable to permit consideration of environmental matters on a broad scope. Piecemealing proposed highway improvements in separate impact statements should be avoided.

The District judge's Finding of Fact No. 2 said that the two segments of I–410 each serve independent transportation goals, that the construction of the first segment did not commit the defendants to construction of the second and that "[t]he economic, social, and environmental impacts of Section I differ from those of Section II." In his Conclusion of Law No. 2 the judge found "The Highway project is not improperly segmented for the purpose of environmental analysis, as Section I and Section II fulfill independent transportation functions. The construction of Section I does not commit the defendant to construct Section II."

We believe that there were genuine issues of material fact presented on these matters and that the district court therefore came to an improper conclusion. Several of the depositions submitted by plaintiffs indicated that a variety of experts believed that the environmental impacts of each segment would not differ from those of the other segment but rather that they would interrelate to affect the whole area and therefore that the project should be considered as a whole. We note particularly the depositions of Stephen Gard, a biologist for the Louisiana Department of Highways, App. Vol. 1, p. 122 at 127–28; Clinton B. Spotts, Chief of the Federal Assistance Branch of the Air and Water Division of the EPA's Region 6, App. Vol. II, p. 182 at 185–87; and Jack Divita, Chief of Air Programs for EPA Region 6, App. Vol. II, p. 192 at 198–202.[12]

---

12. In Sierra Club v. Callaway, 5 Cir. 1974, 499 F.2d 982, this Court indicated that in some instances the rule against segmentation may be inapplicable because of the "practical ne-

In plaintiffs' Sixth Cause of Action they allege both that they did not receive proper notice of the hearings to be held on I–410 and that the hearings themselves did not conform to statutory prescriptions. As we have already indicated above, the district court erred in concluding against plaintiffs on the question of whether the proper notice procedure was used by the Department of Highways when it scheduled the location public hearing for Section I. The district court did not make any findings as to the other allegations contained in the sixth cause—as to the adequacy of the hearings themselves and the draft EIS—and therefore we remand the full cause of action back to that court.

■ Finally, in their Ninth Cause of Action, the plaintiffs contend that the FHWA unlawfully delegated its responsibility for preparation of the EIS to the Louisiana Department of Highways because that department did not have the staff to do a competent environmental review and because the FHWA did not take an active role in reviewing the state's evaluation. The district court's Finding of Fact as to this claim were as follows:

> [T]he incontroverted affidavit of Morris C. Reinhardt, Division Engineer for the State of Louisiana asserts uncontroverted sworn allegations from which this Court finds the following: The Federal Highway Administration independently reviewed and analyzed the Final Environmental Impact Statement, reached its own conclusions about the matters discussed therein, and adopted the statement as its own.

It thus concluded that there was no improper delegation. This Court has recognized that initial responsibility for drafting of the EIS may be delegated to the states. Finish Allatoona's Interstate Right, Inc. v. Brinegar, 5 Cir. 1973, 484 F.2d 638, aff'g D.C., 355 F.Supp. 933. A

contrary position has been taken by the Second Circuit. Conservation Soc. of So. Vt., Inc. v. Secy. of Transportation, 2 Cir. 1974, 508 F.2d 927; Greene County Planning Bd. v. Fed. Power Comm'n, 2 Cir. 1972, 455 F.2d 412.

The uncontroverted affidavit of Mr. Reinhardt, the Federal Highway Department's Division Engineer for Louisiana, maintained that the federal authorities worked closely with the state during the drafting of the EIS and then independently reviewed the product. No affidavit or deposition entered by plaintiffs indicates otherwise. Furthermore, nothing submitted by plaintiffs indicates in any way that the Highway Department lacked the competency to prepare this document. Thus, we agree with the district court that the improper delegation contention was properly disposed of on summary judgment.

*Conclusion:*

The Environmental Protection Act is a legislative command to arouse the countryside to potential ecological embolisms and other desecrations of nature. The act created environmental causes of action and in so doing created potential wards of the environment and endowed them with judicial standing. Before they are cast out because of their failure to exhaust administrative remedies, or latched by the doctrine of laches, the components of these doctrines must be factually etched and not merely surmised. The district judge must have some basis for his analysis. Laches is not a slap on the wrist for tardiness but is made up of explicit criteria. Administrative exhaustion is not a legal automaton but rather a legal conclusion compounded of balancing specific factors. The trial court attempted no such balancing nor did he let us in on the processes by which he came to the conclusion that administrative exhaustion

cessities" of the situation and went on to elaborate on this concept. In the present case the district court judge did not indicate that it was *necessary* for the project to be segmented, merely that environmental assessment could

withstand segmentation. Therefore, on the summary pleadings before us, we do not consider the applicability of that concept to the current project.

was the death knell for plaintiffs in this case.

We believe that plaintiffs here deserve their district court mooring. They have navigated according to our procedural charts and the district court should not have set them back out into the swamps at this stage of the proceedings. On the evidence available to the district court judge, he should not have barred them from a trial on the merits either on the basis of laches or on failure of administrative exhaustion. He should have let them present their case on each of their causes of action, save for that which dealt with delegation.

Affirmed in part, reversed in part and remanded.