614 F.2d 474
 14 ERC 1289, 10 Envtl. L. Rep. 20,302
 ENVIRONMENTAL DEFENSE FUND, INC., Committee for Leaving the
Environment of America Natural, Glenn H. Clemmer,
G. Randall Grace, and F. Glenn Liming,
Plaintiffs-Appellants,
v.
Clifford R. ALEXANDER, Secretary, Dept. of the Army, the
United States Army Corps of Engineers, Dept. of the Army,
and Major General John Morris, Chief of Engineers, Dept. of
the Army, Defendants-Appellees,
Tombigbee River Valley Water Management District,
Tennessee-Tombigbee Waterway Development
Authority, State of Alabama and
Tombigbee Valley Development
Authority,
Intervening
Defendants-
Appellees.
LOUISVILLE AND NASHVILLE RAILROAD, Plaintiff-Appellant,
v.
Clifford R. ALEXANDER, Secretary, Dept. of the Army, the
United States Army Corps of Engineers, Dept. of the Army,
and Major General John Morris, Chief of Engineers, Dept. of
the Army, Defendants-Appellees,
Tombigbee River Valley Water Management District,
Tennessee-Tombigbee Waterway Development
Authority, State of Alabama, and
Tombigbee Valley Development
Authority,
Intervening
Defendants-
Appellees.
 No. 79-2684.
 United States Court of Appeals,
Fifth Circuit.
 March 24, 1980.
Rehearing and Rehearing En Banc Denied April 22, 1980.
 
 Jon T. Brown, Stephen E. Roady, Washington, D. C., James T. B. Tripp, New York City, for plaintiffs-appellants.
 Glenn Whitaker, Lawrence Moloney, U. S. Dept. of Justice, Washington, D. C., for Alexander and Morris.
 Pogue & Pace, Ralph E. Pogue, Aberdeen, Miss., for Water Management Dist.
 Hunter M. Gholson, Columbus, Miss., for Waterway Development Authority.
 William T. Stephens, Asst. Atty. Gen., Montgomery, Ala., for State of Ala.
 H. M. Ray, U. S. Atty., Oxford, Miss., for the U. S.
 David Webb, Mobile Dist., Mobile, Ala., for U. S. Army Corps of Engineers.
 Appeal from the United States District Court for the Northern District of Mississippi.
 Before GEWIN, RUBIN and SAM D. JOHNSON, Circuit Judges.
 ALVIN B. RUBIN, Circuit Judge:
 
 
 1
 This attempt to halt the construction of a federally financed waterway because the width of the waterway exceeds the size authorized by Congress was dismissed by the district court on the basis that it was barred by laches delay in presenting the claim resulting in prejudice to the defendants. We hold that laches was an appropriate defense, that the factual findings on which the district judge based his conclusions were supported by the record and that the legal principles he applied were correct.
 
 I.
 
 2
 The headwater of this litigation commenced to flow forty years ago when the Army Corps of Engineers presented Congress with a preliminary design for the proposed Tennessee-Tombigbee Waterway. The design was reviewed and modified in a report submitted to Congress in 1946. In that year Congress authorized construction of the waterway in accordance with the plans presented to it. Act of July 24, 1946, Pub.L.No. 79-525, 60 Stat. 634. The plans described a waterway that would provide a navigation channel not less than nine feet in depth with a minimum bottom width of 170 feet (called a 170-foot channel), thus permitting two-way barge traffic.
 
 
 3
 Shortly after authorizing construction, Congress decided that the waterway was not economically feasible, and for some time it did not appropriate any funds for construction. However, studies continued. In June, 1966, in response to a request by Congress for restudy of the economic desirability of the project, the Corps of Engineers recommended that the proposed plan be modified to provide for a 300-foot channel (for convenience we refer to this as the 300-foot channel although this is its minimum width at its bottom). A channel of this size would accommodate larger tows and be better suited to changed economic conditions. On November 3, 1966, the Chief of Engineers issued an announcement notifying the public that the restudy of the waterway had been completed, and that it had been determined that the project was better justified economically with a 300-foot channel. Interested parties were invited to present their views and comments concerning the report within thirty days.
 
 
 4
 The restudy report was submitted on March 20, 1967, to the Secretary of the Army with the recommendation that he exercise what the Corps considered his discretionary authority under the authorizing statute to increase the project width to 300 feet, and allow further planning to proceed on that basis. Ten days later the Secretary accepted and acted on this recommendation. He forwarded a copy of the restudy report to the House and Senate Public Works and Appropriations Committees along with a copy of his memorandum reflecting the increase in the project width. Congress did not then or later amend the statutory authorization for a 170-foot channel.
 
 
 5
 On May 18, 1967, the Association of American Railroads, on behalf of the L&N Railroad Company and other railroad companies in the waterway area, submitted a report to the Senate Appropriations Committee specifically suggesting the need for a reevaluation of the project authorization because of the increase in the project's width from 170 feet to 300 feet. See Public Works for Water and Power Resources Development and Atomic Energy Commission Appropriations for Fiscal Year 1969: Hearings on H.R. 17903 Before the Subcomm. of the Senate Comm. on Appropriations, 90th Cong., 2d Sess. 2050, 2054 (1968) (Statement of Tennessee-Tombigbee Waterway Project Committee, Association of American Railroads). Subsequently, the Appropriations Committees recommended appropriation (in fiscal year 1971) of construction funds for the waterway with the increased bottom width. During the budget hearings for fiscal year 1971, representatives of appellants L&N Railroad and Committee for Leaving the Environment of America Natural (CLEAN) appeared before the House and Senate Appropriations Committees to oppose funding of the waterway.[1]
 
 
 6
 Congress appropriated construction funds of $1 million for fiscal year 1971 and $6 million for fiscal year 1972. See Environmental Defense Fund, Inc. v. Corps of Engineers of the United States Army, 348 F.Supp. 916, 924 (N.D.Miss.1972), aff'd, 492 F.2d 1123 (5th Cir. 1974). CLEAN and the Environmental Defense Fund (EDF) filed suit to enjoin the construction of the waterway in 1971. It was stipulated in that suit that the authorized width of the waterway was 300 feet. See id. at 920. Actual construction of the waterway began in 1972. Ultimately, the 1971 suit was dismissed by the court, and construction proceeded.
 
 
 7
 In November, 1976, this suit was filed, again seeking to enjoin construction. Plaintiffs alleged that the project under construction differed substantially from the project authorized by Congress and would have a greater impact on the environment and economic conditions of the surrounding areas, violating both statutory limitations and administrative regulations. However, the increase in the width of the channel was neither mentioned nor challenged. Over a year later, on January 30, 1978, an amended complaint was filed questioning, for the first time, the authority of the Corps to build a 300-foot channel.
 
 
 8
 When this suit was filed, the Corps had spent $36,000,000 out of a total estimated cost of $604,000,000 for channels and canals. By January 30, 1978, when the amended complaint was filed, it estimates it had completed 18% of the total project and spent over $265,000,000. After filing the lack of authority claims, the plaintiffs made no effort to obtain immediate injunctive relief and thus halt the further expenditure of funds or work on the project.
 
 
 9
 The Corps is now obligated on outstanding construction contracts in the amount of $864,302,200. If the project is restricted to a 170-foot channel, some of these funds may be recouped by sale of the unnecessary right of way and by renegotiation of contracts. Those who question authority to proceed urge that a substantial part of the $864 million could be saved if the project were restricted to 170 feet. In response to inquiry by this court concerning amounts spent for construction, the Corps estimates that by September 30, 1978,.$408,651,600 had been spent for construction and $616,007,156 has been spent to the present. The opponents of the waterway state that the following sums have been spent on actual project construction:
 
 
 10
 As of September 30, 1976: $93,314,300.
 
 
 11
 As of September 30, 1977: $176,324,100.
 
 
 12
 As of September 30, 1978: $286,862,900.
 
 
 13
 This is in addition to those costs incurred for purposes other than construction.[2]
 
 
 14
 The district judge did not decide whether the Secretary was authorized to increase the width of the channel because he concluded that the challenge was barred by laches. Deciding only that issue, he directed entry of a final judgment pursuant to rule 54(b) of the Federal Rules of Civil Procedure, making an express determination that there was no just reason for delay and an express direction for the entry of judgment. That order is appealable. See Bailey v. McCann, 550 F.2d 1016 (5th Cir. 1977); B.B. Adams General Contractors, Inc. v. HUD, 501 F.2d 176 (5th Cir. 1974). After discussing the general principles applicable, we will consider separately each of the grounds on which it is urged that we should reverse.
 
 II.
 
 15
 Mindful that we do not sit to decree what accords with "commonsense and the public weal" and that the constitutional separation of governmental powers forbids the Secretary or this court to preempt congressional action, Tennessee Valley Authority v. Hill, 437 U.S. 153, 196, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117, 147 (1978), we review the applicability of the doctrine of laches. What is sought here is an injunction, an equitable form of relief. The doctrine of laches was developed by chancellors of equity to prevent the assertion of stale claims and to remedy an injustice that sometimes arose from the existence of the separate system of equity: when an equitable remedy was sought, the statute of limitations that ordinarily would apply to a legal right was inapplicable.
 
 
 16
 The doctrine was eventually adopted by common law courts and, following the merger of law and equity, became part of the general body of rules governing relief in the federal court system. Its interpretation in equity courts was not uniform; at times the courts required a showing of prejudice to the defendants, at other times the chancellor applied it if a plaintiff had unreasonably delayed the assertion of his claim whether or not the defendant had been prejudiced. One basic principle has, however, been consistently followed: equitable remedies are not available if granting the remedy would be inequitable to the defendant because of the plaintiff's long delay.
 
 
 17
 Today, three independent criteria must be met before laches can be invoked to bar litigation. "The defendant must show: (1) a delay in asserting a right or claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted." Save Our Wetlands, Inc. (SOWL) v. United States Army Corps of Engineers, 549 F.2d 1021, 1026 (5th Cir.), cert. denied, 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977); accord, Gardner v. Panama R. Co., 342 U.S. 29, 72 S.Ct. 12, 96 L.Ed. 31 (1951); Law v. Royal Palm Beach Colony, Inc., 578 F.2d 98 (5th Cir. 1978); Van Bourg v. Nitze, 128 U.S.App.D.C. 301, 388 F.2d 557 (D.C. Cir. 1967). Whether laches bars an action in a given case depends upon the circumstances of that case and is "a question primarily addressed to the discretion of the trial court." Gardner v. Panama R. Co., 342 U.S. 29, 30, 72 S.Ct. 12, 13, 96 L.Ed. 31, 32 (1951).
 
 
 18
 As we have recently said, the applicability of the doctrine of laches to environmental litigation is no longer open to doubt. See Save Our Wetlands, Inc. (SOWL) v. United States Army Corps of Engineers, 549 F.2d 1021, 1026 (5th Cir.), cert. denied, 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977), and cases cited therein. It is equally applicable to suits questioning public authority to act. Ecology Center of Louisiana, Inc. v. Coleman, 515 F.2d 860 (5th Cir. 1975); Clark v. Volpe, 342 F.Supp. 1324 (E.D.La.), aff'd, 461 F.2d 1266 (5th Cir. 1972).
 
 
 19
 The record, which we have already summarized, amply supports the district judge's finding that on November 3, 1966, about a decade before the suit was filed, the Corps gave public notice of its recommendation to expand the width of the canal together with an invitation to the public to submit written comments. Shortly thereafter, the Secretary decided to increase the width. While there is no mention in the legislative history from 1967 to 1976 of the Secretary's explicit invocation of his discretionary authority to widen the waterway, it is evident in the Committee reports and other congressional documents issued in this period that Congress had been informed of the change in plans to make the channel wider. In 1967 the Secretary sent his report to Congress with the recommended changes; both the legislative history and the 1971 Environmental Impact Statement note that the channel is 300 feet.
 
 
 20
 There is also ample evidence that the waterway opponents who appear in this suit were aware of this change: the 1967 opposition to a 300-foot channel by the Association of American Railroads, in part on L&N RR's behalf; the opposition to funding of the 300-foot channel project by CLEAN and EDF in Congress; and the suit to halt construction in 1971. The present waterway opponents did not challenge that decision until 1978, eleven years later. Even if we assume the challenge to have been effective when the complaint was filed in 1976,[3] the delay was nine years. If we accept the contention that appellants remained blissfully ignorant of the increased dimensions throughout the congressional hearings on the waterway and despite the public attention the project received, they were aware of the width increase no later than 1971, when they sought to enjoin construction and stipulated to that width. This suit was not filed until five years thereafter, and the issue of authority to make the width increase was not injected until two years later.
 
 
 21
 Mere neglect to challenge action is not sufficient to establish laches in any case. When government action is involved, members of the public are entitled to assume that public officials will act in accordance with law. Save Our Wetlands, Inc. (SOWL) v. United States Army Corps of Engineers, 549 F.2d 1021, 1027-28 (5th Cir.), cert. denied, 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977). Therefore, apart from the question of prejudice, which we will discuss later, the government must show that those whom it seeks to bar by invoking laches were or should have been aware of the questionable nature of the governmental activity. The waterway opponents in this case had an adequate indication that the Secretary of the Army had unilaterally expanded the width of the canal beyond its statutorily authorized channel width. This was enough to alert them to the claim that the authorities were not acting legally.
 
 
 22
 The appellants urge that it was only in 1976, when the Corps released its reanalysis of the TTW project, that they were aware of a problem in the authorization of the increased channel width and the economic and environmental consequences of that increase. The district judge was entirely justified in concluding that this was not a credible excuse. The waterway opponents' long interest in this project and their activities in opposition to it have already been reviewed. We do not find the trial judge erroneous because he lacked credulity in the contention that the plaintiffs were not aware of the threat posed to their interests by a 300-foot waterway until 1976.
 
 
 23
 Their claim in effect is reduced to the assertion they did not realize it was illegal for the Army to do what it had done. However, laches does not depend on subjective awareness of the legal basis on which a claim can be made. Moreover, although it is impossible for any person to know what is in another's mind, the record contains ample evidence that the problem should have been known; the authorization problem had occurred to others and was evident from the Army Corps of Engineers' discussions of the project and their regulations.
 
 
 24
 Because there is no evidence of any excuse for the lengthy delay, we next consider the final prerequisite to laches: prejudice. Measuring prejudice entails balancing equities. Under the rule as applied in Save Our Wetlands, Inc. (SOWL) v. United States Army Corps of Engineers, 549 F.2d 1021 (5th Cir.), cert. denied, 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977), we are required to consider the expenditures made by the defendants against the benefits claimed if their efforts were halted. Environmental concerns are not presented to us; therefore, unlike the situation in Ecology Center of Louisiana, Inc. v. Coleman, 515 F.2d 860 (5th Cir. 1975), detriment to the environment cannot be a factor in our balance; the benefits we must weigh that could accrue by arresting work can be only those arising from the claimed vindication of congressional authority.
 
 
 25
 The amounts expended may be large in absolute terms but this does not tilt the scales if it represents a relatively small percentage of the total expenditures anticipated. See, e. g., Ecology Center of Louisiana, Inc. v. Coleman, 515 F.2d 860 (5th Cir. 1975) ($1 million had been spent out of a total estimated cost of $667 million). Here by the most conservative estimates, between $176 million and $286 million had been spent before the no-authority claim was asserted. This represented about 11% of the total project cost,[4] far more than the 1/6 of 1% expended in Coleman. Vast amounts of soil had been excavated, locks had been built, and local authorities had constructed bridges. Reshaping the project would not only entail waste of much of those expenditures but also the outlay of additional funds to narrow the channel; moreover, there is substantial evidence that the narrower channel would be economically impractical and would never have been constructed.
 
 
 26
 It is difficult to say that a government agency can be prejudiced by forcing it to comply with the law. The citizenry are prejudiced by the improper outlay of public funds and it is they who suffer if governmental authorities violate the law. However, there is public interest in the prompt presentation of even the most valid objections to public projects from another point of view: those who oppose the unauthorized expenditure of public funds should act timely in order to prevent the utter waste that results if what is done must be undone.
 
 
 27
 Whether or not Congress authorized widening the channel, it has considered environmental impact statements on the project and determined to go ahead. Environmental Defense Fund, Inc. v. Corps of Engineers of the United States Army, 492 F.2d 1123 (5th Cir. 1974). It has continued to appropriate money for the project. Although the public interest and prejudice to that interest cannot always be determined by a kind of economic weighing of how much has been spent, it is a fact that over $176 million had been spent at the time the amended complaint was filed and that much of the waterway has been built. The Corps has shown ample prejudice here both in the wasting expenditure that has occurred and the additional expense of narrowing what has already been built.
 
 
 28
 It is tendentious to assert that the district court had a duty to decide the case on the merits and not to consider the defense of laches. The court surely has a duty to decide all cases and controversies within its jurisdiction, but we know of no duty to resolve the case on a particular basis. While the defense of laches is, as we have already pointed out, directed to the remedy, the decision of the case on that basis need not turn upon or follow a decision on the merits.
 
 
 29
 The defense is not restricted to cases in which only private law claims are asserted; it is also applicable to complaints based on constitutional claims and those based on alleged violation of separation of powers. The doctrine bars us from granting an equitable remedy sought by plaintiffs. If the defense is established, the court's musings about how the case might have been decided on the merits if timely filed and if we could grant relief would surely be the rendering of an advisory opinion in violation of the constitutional stricture. See U.S. Const. art. 3, § 2; Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-41, 57 S.Ct. 461, 464, 81 L.Ed. 617, 621 (1937).
 
 
 30
 The argument that the district court denied plaintiffs due process by giving assurances that laches was not an issue lacks any foundation in the record and is indeed belied by it. Buttressed only by factual affidavits filed in this court for the first time, in disregard of our function as an appellate court, one of plaintiff's counsel asserts that he spoke to one of the judge's law clerks who told counsel that the judge did not plan to take evidence on any issue but the authorization for the project at the hearing and that all other issues including affirmative defenses would be heard later. We repeat the argument in order to give it express condemnation: courts speak to litigants by orders or minute entries or judgments or, on occasion, at conference in chambers. Ex parte communications with judges are generally disfavored. Code of Judicial Conduct for United States Judges, Canon 3 A(4). A fortiori, neither ex parte communication with a judge's clerks nor reliance upon such communication can be condoned.
 
 
 31
 Moreover, the record does not support the notion of reliance on this communication: prior to the hearing, both the United States and the plaintiffs filed briefs addressing the issue of laches in relation to the authorization question, and, in his opening statement, counsel for the United States urged the issue on the court. Plaintiffs' counsel expressed no objection either to the statement or to the evidence introduced. Neither did counsel urge to the court that fair notice of the issue had not been given; in fact, plaintiffs' counsel recommended a conclusion of law on the laches issue favorable to their position. The contention is, therefore, completely without merit.
 
 
 32
 Laches is a clement doctrine. It assures that old grievances will some day be laid to rest, that litigation will be decided on the basis of evidence that remains reasonably accessible and that those against whom claims are presented will not be unduly prejudiced by delay in asserting them. Inevitably it means that some potentially meritorius demands will not be entertained. But there is justice too in an end to conflict and in the quiet of peace. The district court concluded that the day for battle on the authorization issue had come and gone and that the question should now be laid to rest unheard. Finding his factual premises supported by the record and his conclusions of law correct, we AFFIRM his judgment.
 
 
 
 [1]
 See Public Works for Water, Pollution Control, and Power Development and Atomic Energy Commission Appropriation Bill, 1971: Hearings Before the Subcomm. of the House Comm. on Appropriations, 91st Cong., 2d Sess. 391, 397 (1970); Public Works for Water, Pollution Control, and Power Development and Atomic Energy Commission Appropriations for Fiscal Year 1971: Hearings on H.R. 18127 Before the Subcomm. of the Senate Comm. on Appropriations, 91st Cong., 2d Sess. 467 (1970)
 
 
 [2]
 Focusing on "construction costs," the waterway opponents assert that money spent for historical and archeological surveys was not a part of construction costs, and that amounts spent for engineering and design and supervision and administration should not be counted toward money spent on construction because some of the design could be used if there were a 170-foot rather than a 300-foot project. However, at least some of these expenditures could not be recovered
 
 
 [3]
 We think the district judge properly measured injury at the time the challenge to the channel width was made, January 30, 1978, and not at the time the original complaint was filed. Our discussion of prejudice, therefore, will focus on the date this amended complaint was filed. In some circumstances application of a statute of limitations may depend upon when suit was filed and not when a particular claim is made, for the claim may relate back to the original complaint. See Fed.R.Civ.P. 15(c); Tiller v. Atlantic Coast Line R. Co., 323 U.S. 574, 65 S.Ct. 421, 89 L.Ed. 465 (1945). However, laches rests on policy concerns different from those of statutes of limitations. The challenge to the channel width is fundamental and strikes at the heart of the project. It was appropriate to appraise injury to defendants at the time plaintiffs actually asserted the claim, rather than at the time at which they began to raise other challenges to the project
 
 
 [4]
 This is, of course, a very rough estimate, taking into account the uncertainty, based on appellants' figures, of exactly how much had been spent at the time the amended complaint was filed, and taking the most recent estimate for initial total project cost available. ($1,925,000,000) The figure is probably conservative; the government estimates it at 18%