**INMAN PARK RESTORATION, INC., Intervenor (formerly Reynoldstown Civic Improvement League, Inc.), et al.**

v.

**The URBAN MASS TRANSPORTATION ADMINISTRATION et al.**

**SAVE OUR SYCAMORE and Donald H. Mahaffey**

v.

**METROPOLITAN ATLANTA RAPID TRANSIT AUTHORITY et al.**

**INMAN PARK RESTORATION, INC., et al.**

v.

**METROPOLITAN ATLANTA RAPID TRANSIT AUTHORITY et al.**

Civ. A. Nos. C 75–717A, C 75–928A and C 75–1306A.

United States District Court,
N. D. Georgia,
Atlanta Division.

Nov. 7, 1975.

Supplemental Order March 12, 1976.

Richard B. Ellenberg, Atlanta Legal Aid Society, Inc., Atlanta, Ga., for Reynoldstown.

John R. Myer, Atlanta, Ga., for Inman Park, Robert Seagress and Rodney Eaton.

Richard N. Hubert, Robert L. Schwind, Haas, Holland, Levison & Gibert, Atlanta, Ga., for Save Our Sycamore and Donald H. Mahaffey.

William D. Mallard, Jr., J. Robert Cooper, Asst. U. S. Attys., Atlanta, Ga., for Federal defendants.

W. Stell Huie, G. Donald Johnson, Bettie W. Driver, Huie, Ware, Sterne, Brown & Ide, Atlanta, Ga., for Metropolitan Atl. Rapid Transit Authy. (MARTA).

Wendell K. Willard, Decatur, Ga., for De-Kalb County.

JAMES C. HILL, District Judge.

## ORDER

## BACKGROUND

The Reynoldstown Improvement League, Inc. and individual residents of the Reynoldstown area initiated Civil Action No. 75–717 seeking declaratory and injunctive relief against the Urban Mass Transportation Administration (UMTA); the United States Department of Transportation (U.S. DOT); the Metropolitan Atlanta Rapid Transit Authority (MARTA); William T. Coleman, individually, and in his official capacity as Secretary of the United States Department of Transportation; and Frank C. Herringer, individually, and in his official capacity as the Administrator of the Urban Mass Transportation Administration.

On August 13, 1975, Inman Park Restoration, Inc. and two individual members were allowed to intervene as plaintiffs in the Reynoldstown suit. At the same time they filed their own action, Civil Action No. 75–1306.[1] Reynoldstown ceased being an active party on September 8th when it filed a stipulation of dismissal, but Inman Park continued to take an active part in both suits.

Plaintiffs in the Reynoldstown and Inman Park suits allege that pursuant to the National Environmental Policy act of 1969 (NEPA), as amended, 42 U.S.C. § 4331 et seq. and regulations promulgated pursuant thereto, defendants must perform a supplemental Environmental Impact Statement (EIS) on each proposed rapid transit station and accompanying development, including the proposed Moreland Avenue Station located between Reynoldstown and Inman Park. In the alternative, plaintiffs allege that the original EIS prepared on the entire MARTA System is inadequate and must be redone in advance of the construction of any of the transit stations. In addition, plaintiffs seek to have the court order the defendants to comply with section 106 of the National Historic Preservation Act, 16 U.S.C. § 470 et seq. as it relates to Inman Park. Allegations are also presented under section 4(f) of the Department of Transportation Act, as amended, 49 U.S.C. § 1653(f) and section 14(c) of the Urban Mass Transportation Act of 1964, as amended, 49 U.S.C. § 1610(c).

Plaintiff Inman Park Restoration, Inc. is a Georgia non-profit corporation incorporated in 1971. Its membership includes approximately 175 families who reside in the residential community located in the eastern portion of the City of Atlanta commonly referred to as Inman Park. The plaintiff corporation is dedicated to the purpose of improving, enhancing and protecting all aspects of the residential community in which its members reside. Plaintiffs Robert Segrest and Rodney Eaton are adult citizens of the United States who are residents and homeowners within the Inman Park Community and members of plaintiff Inman Park Restoration, Inc.

Save Our Sycamore (SOS), a non-profit unincorporated neighborhood association, and one resident of Sycamore Street, Donald Mahaffey, seek declaratory and injunc-

---

1. The Court apprehends the Inman Park filed Civil Action 75–1306 as a precaution against the Court denying its application to intervene in the Reynoldstown suit. The Court notes that the complaint in intervention filed in 75–717 and the complaint filed in 75–1306 set out identical claims and requests for relief. With the withdrawal of Reynoldstown as participant in these proceedings and the assumption by Inman Park of being the only active plaintiff in 75–717, there appears to be no reason why both cases need to remain open. Consequently, in the interest of efficiency, the Court directs that Civil Action 75–1306 be consolidated with Civil Action 75–717 and, with the consent of counsel for Inman Park, directs that Civil Action 75–1306 be DISMISSED.

The style of Civil Action 75–717 should be changed by striking Reynoldstown and the individuals associated with Reynoldstown as plaintiffs and inserting instead Inman Park and the individuals associated with Inman Park.

tive relief in Civil Action No. 75–928 to restrain the defendants from financing or constructing a rapid transit station adjacent to or near the DeKalb County Courthouse and from financing or constructing a rapid transit rail line from the Georgia Railroad to the DeKalb County Courthouse and back to the Railroad along Sycamore Street. Plaintiffs also seek to stop the condemnation or purchase of any land in furtherance of the construction of a rapid transit station or line in this area.

Plaintiffs in the *SOS* case rely upon the same statutory authority as plaintiffs in the *Inman Park* case. Specifically, SOS plaintiffs allege that the defendants have not prepared a detailed EIS pursuant to NEPA for the proposed MARTA station at Decatur Square and for the rail alignment running eastward from Decatur Square along Sycamore Street. Plaintiffs contend that the EIS which was prepared did not give adequate consideration to alternative station sites and rail locations. Plaintiffs further allege violations of section 4(f) of the Department of Transportation Act and section 106 of the National Historic Preservation Act with respect to the taking of a portion of the land surrounding the DeKalb County Courthouse and the alignment eastward along Sycamore Street.

Plaintiff, SOS, is a non-profit, unincorporated association created in 1974 consisting of over eighty (80) members who reside in the City of Decatur, Georgia, several of whom reside on Sycamore Street in the City of Decatur, Georgia. The purposes of SOS are to promote, protect, and preserve the historical monuments, architectural beauty, and environmental amenities of the City of Decatur, as well as the Old DeKalb County Courthouse and the Victorian era homes on Sycamore Street in the City of Decatur, and further to protect plaintiff members' homes on Sycamore from condemnations, seizure, demolition and destruction by defendant MARTA.

Plaintiff Donald H. Mahaffey, is a natural person who resides at 805 Sycamore Street. He has asserted an interest in the protection and promotion of the Old De-Kalb County Courthouse, the architectural beauty and environmental amenities of the City of Decatur, the architectural beauty, historical uniqueness, environmental amenities of Sycamore Street, and the Victorian era homes thereon, and further the privacy and integrity of his home from condemnation, seizure and destruction by defendants.

Defendant MARTA is a public authority created and existing under the laws of the State of Georgia, and is charged with the responsibility of constructing a rapid transit system in Fulton and DeKalb Counties. Defendant William T. Coleman is the United States Secretary of Transportation, an agency of the United States government, and in that position he has supervision over and responsibility for, administering various federally-aided transportation programs, including those relating to the financing of MARTA's rapid transit system. Defendant Frank C. Herringer is the Administrator of the Urban Mass Transportation Administration, and in that position he has supervision over and responsibility for, administering various federally-aided mass transportation programs, including those related to the financing of MARTA's rapid transit system. Defendant DeKalb County is a body corporate and politic created and existing under the Constitution and laws of the State of Georgia.

In April, 1975, Reynoldstown and the named plaintiffs sought a temporary restraining order restraining MARTA from demolishing any buildings in the Reynoldstown area or from proceeding in any manner with the construction of the Moreland Avenue Station. Plaintiffs' motion for temporary restraining order was denied by the Court.

Then, in May, 1975, SOS and Donald Mahaffey sought a temporary restraining order restraining MARTA from condemning or otherwise acquiring land and from demolishing buildings or houses at the site of the proposed MARTA station at Decatur Square and in the right-of-way of the rail alignment east of that station. Plaintiffs' motion for said temporary restraining order was denied by the Court.

The Court consolidated the Reynolds-town, Inman Park, and SOS suits for trial purposes and set all motions down for a final hearing on September 8, 1975. The Court heard four days of oral evidence in addition to admitting voluminous documentary evidence. It was, however, stipulated that all administrative procedures had not been completed with respect to claims based upon the Department of Transportation Act, the Urban Mass Transportation Act, and the National Historic Preservation Act. While the Court received evidence touching upon the claims under these Acts, the Court will not issue any final order on these claims until the parties have completed the record.

Finally, as a preliminary matter, the Court finds that it has jurisdiction to entertain these actions and to determine the questions presented pursuant to 28 U.S.C. §§ 1331 and 1337 and 5 U.S.C. § 701 *et seq.*

## FINDINGS OF FACT

### 1.

In the early 1960's Atlanta regional planners determined that there existed in the territory comprising the counties of Cobb, Fulton, DeKalb, Clayton and Gwinnett, including the City of Atlanta (sometimes referred to as the "metropolitan area"), serious traffic conditions, congestion and mass transportation deficiencies which would increasingly impede the cultural and social development of the area and which would prevent the economic wellbeing of the people from reaching its fullest potential.

### 2.

The Metropolitan Atlanta Transit Study Commission proposed a rapid transit system for the metropolitan Atlanta area in 1962.

### 3.

In November, 1964, the people of the counties of Fulton, DeKalb, Cobb, Clayton and Gwinnett and the City of Atlanta approved the 1964 Rapid Transit Amendment to the Constitution, Article XVII, Section I, Paragraphs I–V (Ga.Code Ann. §§ 2–8601—8605). This constitutional amendment in Paragraph I acknowledges that:

The acquisition, establishment, operation or administration of a system of public transportation of passengers for hire within metropolitan area . . . is an essential governmental function and a public purpose for which the powers of taxation and eminent domain may be exercised and public funds of said counties and municipality expended.

By this amendment, the General Assembly was authorized to create an Authority for the purpose of accomplishing the aforesaid governmental function, to permit the named local governments to contract with the Authority for such purposes, and to levy taxes in order to finance such function.

### 4.

In 1965, the General Assembly passed the Metropolitan Atlanta Rapid Transit Authority Act (hereinafter "MARTA Act") of 1965 (Ga.Laws 1965, p. 2243), acting pursuant to the authority given it under the 1964 constitutional amendment set forth above. In this Act, the General Assembly provided that there should be further referenda in each of the local governments for the purpose of determining whether or not each of said governments desired to participate in the Authority.

### 5.

In 1965, referenda were held in each of said local governments, and all but Cobb County determined to participate in the Authority. In 1966, the General Assembly amended the MARTA Act to confirm the participation of those governments which had determined to participate and to provide another procedure for future participation by Cobb County (Ga.Laws 1966, pp. 3264, 3265).

### 6.

In 1966, the General Assembly proposed another amendment to the Constitution of Georgia (Article VII, Section II, Paragraph I, Ga.Laws 1966, p. 1080) (Ga.Code Ann. § 2–5501), which was ratified by the people at the General Election held in November of 1966, and which provided that:

Public transportation of passengers for hire is an essential governmental function

and a public purpose for which the power of taxation of the State may be exercised and its public funds expended . . . .

This general constitutional amendment, applicable to the entire state, permitted state funds to be used to cover 10% of the costs of a local rapid transit system.

7.

In 1966, the General Assembly also proposed another amendment to the Constitution (Article VII, Section IV, Paragraphs I–VI, Ga.Laws, 1966, p. 1066) (Ga.Ann. §§ 2–5701—5706), which was voted on and approved by the public statewide and which provided in Paragraph II thereof that:

In addition to such other powers and authorities as may be conferred upon any county by this Constitution or by the General Assembly, counties are hereby authorized to exercise the power of taxation for the following purposes . . . acquire, construct, maintain . . . facilities for mass transit.

This constitutional amendment was also a general constitutional amendment applicable to the entire State of Georgia.

8.

In 1971, the General Assembly of Georgia passed two substantial amendments to the Metropolitan Atlanta Rapid Transit Authority Act of 1965. One of these, Georgia Laws, 1971, pages 2082–2091, added a completely new section 25, which permitted each of the local governments authorized to participate in the Authority to levy a one percent (1%) sales and use tax for the purpose of fulfilling its obligations under a contract with MARTA to construct and operate a rapid transit system. This sales and use tax, however, was to be levied only after another successful referendum in the local governments.

9.

In November of 1971, the people of Fulton and DeKalb counties approved the Rapid Transit Contract and Assistance Agreement (the "Contract") between and among the City of Atlanta, the counties of Fulton and DeKalb and MARTA, as required by the MARTA Act, thereby permitting the levy of the sales and use tax for rapid transit purposes in Fulton and DeKalb Counties. Clayton and Gwinnett Counties declined participation by failing to approve the contract at referenda held in each of those counties. Pursuant to the favorable vote of the people in November 9, 1971 referendum, Fulton and DeKalb Counties levied the Rapid Transit Sales and Use Tax which became effective April 1, 1972, in accordance with said Act.

10.

Since 1964 the people of Fulton and DeKalb Counties have had the opportunity to vote on various aspects of rapid transit, i. e., constitutional amendments, participation in the Authority and the financing of the Authority, including the permissible use of state and local funds for such purposes on five separate occasions. (This does not include the unsuccessful vote in 1968 of the financing plan which was based upon further increases in the ad valorem tax.) It is a significant fact that Section 24(f) of the MARTA Act (Ga.Laws 1971, p. 2103) required that the entire contract between MARTA and the local governments, be published in a newspaper having general circulation throughout the territory of the governments involved prior to the vote thereon in the referendum held November 9, 1971. It was on the approval of this contract that the issue was put to the people. Affirmative approval of the contract permitted the local governments to levy the sales and use tax for the purpose of the contract.

11.

The environmental benefits to be obtained from the development of the MARTA System have been an inherent part of the planning from its early origins. The decision to use the existing railroad corridors radiating from the central city was made because of a conscious effort to minimize the impact that construction of such a system would have upon the community. These existing rail corridors had already influenced the development of neighborhoods around them. Avoiding the further disruption of these neighborhoods was a

major factor in choosing the primary corridors for development of the MARTA rail lines.

### 12.

In connection with each of the referenda described, there were expansive public information programs, brochures and other materials which communicated to the public a knowledge of the overall impacts, including the environmental impacts of the rapid transit system. Specifically, an Engineering Report, dated September, 1971, prepared by MARTA's General Engineering Consultant, Parsons, Brinckerhoff, Todor-Bechtel (PBTB), was also approved in said November 1, 1971 referendum. This Engineering Report put the basic rapid transit system together with transit stations shown at approximately the present locations.

### 13.

At each step in the planning process and the implementation stage, news media coverage of the MARTA plans and system has been extensive. Not only have the required legal notices been placed in the newspapers for the various referenda, public hearings and other meetings, but news coverage of the actions of the Authority in making decisions with regard to the location of the system and its impact on communities has been extensive as well.

### 14.

More specifically relating to the East Line and its impact on the Reynoldstown, Inman Park and Decatur communities, facts found in the following paragraphs are particularly relevant.

### 15.

The initial decision to utilize existing railway rights-of-way to the maximum extent possible was made as early as 1961. The East Line was proposed in essentially its present form in 1961, with stations at Moreland Avenue and Decatur. At that time, however, the Decatur Station was to be located on the Georgia Railroad right-of-way.

### 16.

The 1962 Metropolitan Atlanta Transit Study Commission plan, proposed a Moreland Avenue Station located along the Georgia railroad just east of Moreland Avenue. The Decatur Station was located along the railroad, between McDonough Street, and Trinity Place. The 1962 Plan also evaluated various alternatives to the proposed system. These alternatives included an all bus alternative, a combination bus and rail alternative, and an alternative which would use the existing railroad system.

### 17.

In 1967, it was proposed that the Moreland Avenue Station be located approximately half-way between the proposed East Atlanta Tollway and Moreland Avenue, approximately where it is now planned. The Decatur Station was to be approximately 200 feet north of the railroad at Barry Street.

### 18.

In the fall of 1967, a series of meetings took place between MARTA, PBTB personnel, and the City Manager of Decatur. At that time, the City Manager of Decatur urged that the Decatur Station be located in downtown Decatur near the DeKalb County Courthouse.

### 19.

The Eric Hill *Corridor Impact Study* of 1968 recommended a downtown Decatur location, near the intersection of Trinity Place and McDonough Street.

### 20.

In April, 1968, the City Council of Decatur passed a resolution requesting that the Decatur Station be located on Trinity Place. Studies for that proposed location were prepared.

### 21.

At the public meeting on May 13, 1968, at the Decatur Recreation Center, it was announced that MARTA was studying a suitable downtown site for the Decatur Station.

### 22.

On July 1, 1968, MARTA and PBTB met with the Decatur City Commissioners and

suggested placing the Station near the old Courthouse Square. All present approved the proposal.

23.

The proposed system adopted by the MARTA Board and submitted to the voters in the 1968 referendum incorporated a Decatur Station in its present location, south of the old DeKalb County Courthouse. The line ran east on Sycamore Street to Candler Street, where it curved south, returning to the railroad about midway between Columbia Drive and Sams Crossing. The site proposed for the Moreland Avenue Station at the time of that unsuccessful referendum was nearly identical to that presently proposed.

24.

In a report prepared for the Atlantic Area Transportation Study in January, 1971 (financed by the Georgia Highway Department and by MARTA), a series of transportation alternatives were evaluated. The report recommended expansion of the existing highway system and implementation of a rapid transit system as soon as possible.

25.

On January 22, 1971, concern was expressed by Decatur and DeKalb officials about the 1968 rail alignment east of the Courthouse in light of the townhouses which had been constructed near the corner of N. Columbia Drive and Sycamore Street. Alternatives were studied, including a transit line one block south of the proposed line, and a line along Swanton Way and Sycamore Street.

26.

In March, 1971, a number of alternative alignments in downtown Decatur were evaluated.

27.

At the public hearing held on July 23, 1971, in the DeKalb County Courthouse, the present alignment along Sycamore Street was explained publicly. No objection was raised to the alignment, and support was voiced publicly for the downtown alignment.

28.

The alignment proposed and approved in the 1971 referendum included a Moreland Avenue Station located partially over the proposed East Atlanta Tollway, with the east end of the station even with Battery Place. The Decatur Station was located at the old DeKalb County Courthouse, and the line east of the Courthouse was to follow Sycamore Street to N. Columbia Drive, where it would veer slightly south, going through the block between Sycamore Street and the Georgia railroad.

29.

A composite report on the Rapid Transit System for Metro Atlanta, was published in September, 1971. That report, prepared in part by a grant for technical studies from the U. S. DOT summarized the findings and recommendations of consultants employed by MARTA in the development of a comprehensive, balanced transportation plan for Greater Atlanta.

30.

A report prepared and distributed in July, 1972 by the Department of Community Improvement of the City of Decatur included a map of the proposed route through the block between Sycamore Street and the railroad.

31.

The preparation of the Environmental Impact Statement took approximately one year to complete. In the course of its preparation, public meetings were held throughout the Atlanta area. In addition, there followed a final formal public hearing on November 13, 1972, at which a transcript was made. During this public hearing, the decision to locate the Decatur Station downtown was reviewed and Wiley S. Ansley, Mayor of Decatur, read a statement expressing support for the proposed downtown alignment.

32.

Citizen involvement in Decatur culminated in January, 1973, with the completion of the Decatur Rapid Transit Impact Growth Strategy, prepared by a team of profession-

als (an architect/urban designer, city planner, economist, sociologists, transit consultant, and landscape architect) working together with a team of representative citizens and elected officials. The team produced recommendations for short and long-range goals, land use recommendations for the entire City, and urban design growth systems for the 2500 foot radius. This study which reaffirmed the decision to locate the Decatur Station and the rail alignment through Decatur in its present location was funded jointly by the Department of Transportation, ARC, and the City of Decatur.

33.

In June, 1973, MARTA's EIS was approved by UMTA. The EIS is a 504 page document which includes 1,981 pages of technical appendices.

34.

The Inman Park residential community has been identified and determined to be a Historic District and pursuant to 16 U.S.C. § 470 has been placed on the National Register of Historic Sites. Plaintiff Inman Park first made application for placement on the National Register on or about October, 1970, and was placed on the National Register on July 23, 1973. The general boundaries of the Inman Park Community are as follows: DeKalb Avenue on the south, the now defunct 485 right-of-way land on the west, the northern side of Lake Avenue from Elizabeth Street to Waddell Street, the westerly side of Waddell Street between Lake Avenue and Edgewood Avenue, the southern side of Edgewood from Waddell Street to Krog Street, and the eastern side of Krog Street from Edgewood Avenue to the south side of DeKalb Avenue.

35.

The federal defendants have authorized at least $800,000,000, pursuant to the Urban Mass Transit Act, for the eventual completion of the Atlanta system. As of July, 1975, the federal defendants had approved the expenditures by MARTA of $269,904,-333 for the construction of the Rapid Transit System.

36.

The MARTA Rapid Transit System consists of fixed radial rapid transit tracks emanating from the Atlanta central city including an East Line which passes through the Inman Park area. The MARTA System also contemplates rapid busways, as well as extensive feeder bus system. Located on the various rapid transit lines will be 37 rapid transit stations, including the Moreland Avenue Station, which is located in the Inman Park area on the East Line.

37.

The MARTA mass transit program consists of ten phases of development: Phases 1, 2 & 3: acquire old Atlanta Transit System, expand bus service; Phase 4: Construct East Rail Line, West Rail Line; Phase 5: Construct Five Points Station, extend West Line, construct Proctor Creek Rail; Phase 6: Construct Central Rail south of Five Points and South Rail to Lakewood; Phase 7: Complete construction of Central Rail Line to Pershing Point Station; Phase 8: Construct Northeast Rail Line to Lenox Road; Phase 9: Extend East Line, West Line, South Line, Northeast Line; Phase 10: Extend Northeast, construct Northwest, Southwest.

38.

The presently proposed MARTA station and rail alignment at Decatur Square requires the permanent taking of approximately 7890 square feet and the temporary taking of an additional 8775 square feet of the Courthouse grounds which contain a total of about 1.32 acres or 57,519 square feet. The old DeKalb County Courthouse is an historic monument of state significance and said Courthouse and grounds have been listed on the National Register of Historic Places since August 26, 1971.

39.

The presently proposed MARTA rail alignment between the proposed Decatur Station and the proposed Avondale Station would require the taking of eight (8) Victo-

rian-era homes on Sycamore Street and would adversely impact several others.

40.

On July 26, 1971, the Georgia State Liaison Officer nominated the old DeKalb County Courthouse for inclusion on the National Register of Historic Places, recommending the significance of the same to be at the "state" level.

41.

On August 26, 1971, the Keeper of the National Register of Historic Places certified that the old DeKalb County Courthouse was included on the National Register of Historic Places.

42.

On August 5, 1975, David M. Sherman, Georgia State Historic Preservation Officer, in a letter to the United States Department of Interior Office of Archaeology and Historic Preservation, set forth his finding that both sides of Sycamore Street are eligible for nomination to the National Register.

43.

By letter and attachments dated March 16, 1973, MARTA applied to the Department of Transportation for a grant under the Urban Mass Transit Act to assist in financing of the MARTA Rapid Transit System.

44.

By letter dated June 29, 1973, the Department of Transportation approved said application for such grant and entered into a grant contract with MARTA pursuant to which MARTA was authorized to proceed with its plans for the construction of the proposed East Line. This grant contract included approval of land acquisition for all of the East Line, which includes the properties on Syeamore Street.

45.

At the time of the 1971 referendum, the proposed Moreland Avenue Station had its eastern edge almost even with Battery Place. The Station was to be built on a bridge structure, over the site of the proposed East Atlanta Tollway. Due to the continuing uncertainty of the Tollway there was a minor shift in the Moreland Avenue Station in 1973. At that time, the Station was shifted slightly eastward along the railroad tracks out of the Tollway right-of-way.

46.

As recently as September 4, 1974, MARTA was notified by the Georgia Department of Transportation that the Department was still committed to construction of the East Atlanta Tollway. It was not until October 9, 1974, that the Department notified MARTA that it no longer planned to construct the Tollway. Likewise, only in October, 1974, did MARTA officials become aware that no funds would be available for construction of the Decatur Parkway.

47.

The Transit Station Area Development Study for the Decatur Station was completed November 18, 1974. This Study evaluated the impact of the station upon the surrounding area.

48.

Patronage studies of the Moreland Avenue Station have continued to indicate a need for the station.

49.

Studies performed by MARTA consultants in early 1975 indicated that engineering constraints preclude the possibility of shifting the Moreland Avenue Station back into the East Atlanta Tollway right-of-way without impacting the buildings on the north side of DeKalb Avenue. The maximum westward shirt feasible was found to be 40 feet.

50.

In January, 1975, the Atlanta Regional Commission reported the status to date of its Transit Station Area Development Studies. These studies were financed in part by funds provided by UMTA.

51.

Defendant MARTA completed additional plans and development for the Moreland Avenue Station in August, 1975, which represents a 30% degree of the station design.

**52.**

The proposed Moreland Avenue Station will or may produce the following significant effects on the Inman Park Community:

(a) Parking lots;

(b) Additional noise;

(c) Visual impact from the station, parking lots, power substation;

(d) Increased air pollution;

(e) Increased traffic through the Inman Park Community, including both additional automobile traffic and bus traffic directly caused by the presence of the Moreland Avenue Station;

**53.**

In February, 1975, the federal defendants approved defendant MARTA's Second Amendment to the Application for Capital Assistance.

**54.**

In June, 1975, the federal defendant approved defendant MARTA's Third Amendment to the Application for Capital Assistance.

**55.**

In October, 1974, an agreement was entered into between MARTA and the City of Decatur whereby MARTA agreed to raise the level of the Decatur Station in order to conform to Decatur's Transit Area Study and to conform MARTA's plans with the goals identified in the Decatur Rapid Transit Impact Growth study.

**56.**

In response to concerns expressed by Donald Mahaffey and SOS, alternatives to the present Sycamore Street alignment were evaluated by MARTA in early 1975. Study of one alternative, a Columbia Drive alignment, revealed that the eight residences in question on Sycamore Street would not be affected, but that other residences, including the Williams-Evans house which has been determined to be eligible for inclusion on the National Register of Historic Places would be destroyed and that a portion of the Decatur Recreation Center's front yard would be lost. Another alternative, extension of the subway, would take the same residences as the presently proposed alignment, and would cost about $4.5 million dollars more. A third alternative, consists of the construction of a retaining wall to act as a buffer.

**57.**

On May 27, 1975, the DeKalb County Board of Commissioners resolved to convey to MARTA easements for the construction and operation of the Decatur Station.

**58.**

On August 14, 1975, the Keeper of the National Register of Historic Places declared Sycamore Street eligible for inclusion on the National Register of Historic Places as an historic district.

**59.**

Concerns about the environmental impact of the MARTA System have evolved and the responses to them have been expressed in the following documents:

(a) MARTA EIS.

(b) Comments by City of Atlanta officials on Moreland Avenue Station.

(c) Moreland-Inman Park-Reynoldstown Station Concept and Design Plans, City of Atlanta Planning Department, December, 1973 (funded in part by the Department of Transportation under Section 9 of the UMTA Act).

(d) Letter from W. D. McEwen, MARTA Design and Engineering, to W. O. Salter, PBTB Project Director, September 20, 1974.

(e) *Conceptual Design Report for MARTA for Moreland Avenue Station.*

(f) EIS Criteria and Standards for the Environment Volumes I thru V.

**60.**

Continuing studies on the environmental impact of the MARTA System and its components are being prepared.

## CONCLUSIONS OF LAW

### LACHES

Defendants have asserted one affirmative defense that needs to be discussed prior to

reaching the merits of the case. Relying mainly upon *Clark v. Volpe,* 342 F.Supp. 1324 (E.D.La.1972), *aff'd.* 461 F.2d 1266 (5th Cir. 1972), defendants assert that plaintiffs are barred from bringing the present actions by the equitable doctrine of laches. While it is true that the doctrine of laches is applicable to suits brought under NEPA, the Court does not find that the facts of these actions warrant the application of the doctrine of laches.

The facts existing in *Clark* are inapposite to the situation *sub judice.* In *Clark* the plaintiffs were attempting to halt the construction of a highway through a park. When suit was finally initiated, construction through the park had already commenced to the point where 20–25% of the total work had been completed. The facts in the present cases show that, while defendants have already expended a great deal of money in buying land and preparing engineering reports, no on-site physical construction has been started on any of the areas directly affected by these actions.

In *Ecology Center of Louisiana, Inc. v. Coleman,* 515 F.2d 860 (5th Cir. 1975), the Court set out the correct analysis to use in determining whether or not laches is applicable to a suit under NEPA. It noted that three independent criterion must first be met: (1) Defendants must show a delay in asserting a right or claim, (2) that the delay was not excusable, and (3) that there was undue prejudice to the party against whom the claim is asserted. In assessing the nature and the amount of prejudice resulting to defendants the Court set out two standards: (1) The amount of the actual expenditures of the defendant agencies, and (2) the Congressional definitions of prejudice to agencies in a NEPA case. In other words, what are the real interests of the defendants. As stated by the Court at page 868:

> . . . Any agency action must be evaluated not only in terms of the cost of slowing transportation system development and funds committed in that pursuit, but also, in the cost of unnecessary environmental harm.

As an example, in *Clark* the application of the doctrine of laches was proper where the defendants showed a high level of prejudice in that great amounts of money had already been expended, the planned transportation goals would be destroyed, and no environmental benefits would be enjoyed by stopping the project since much of the destruction of the park land had already been accomplished.

On the other hand, the facts in the cases before the Court more closely parallel the factual situation in *Coleman.* Although, a great amount of money, time, and effort has already been expended, when compared to the total amount to be spent on the MARTA project it represents only a small percentage. Further, since no actual physical construction has commenced on the segments now under dispute, there may still be great environmental benefits to be derived from the litigation of the present actions. Thus defendants have not shown "prejudice beyond a genuine question to the accomplishment of their statutorily charged duties." *Coleman* at 869.

As in *Coleman,* the Court does not need to find whether or not the first two criterion of laches have been met. However, the Court does note that the concept of MARTA and a rapid transit system for the metropolitan Atlanta area has been publically discussed since the early 1960's. There have been innumerable public meetings at which MARTA's proposed route has been presented and where members of the public have had the opportunity to object to the details of the MARTA route. The people of Fulton and DeKalb counties approved basically the present alignment of MARTA. It is interesting to note that none of the named plaintiffs ever attended any public meeting or voiced any objection to the proposed MARTA alignment at any time prior to the approval by the federal defendants of MARTA's Capital Assistance Grant. The entire idea of having public meetings from the inception was to allow public input into the detail planning of the MARTA route and to eliminate the necessity of suits as are presently pending. The Court finds

it indeed unfortunate that plaintiffs did not take full advantage of the opportunities given them to influence the decision makers at a time when it would have been relatively easy and inexpensive for a compromise to be reached.

## CONCLUSIONS OF LAW

### NATIONAL ENVIRONMENTAL PROTECTION ACT

NEPA has been the subject of much litigation since its enactment by Congress in 1969. It is well settled that it imposes upon administrative agencies of the United States government both procedural and substantive requirements which must be carried out prior to the commitment of federal money to a particular project. *See e. g. Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission,* 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971). The broad purpose of the Act is to require administrative agencies which are involved in the process of developing a project to consider the environmental impact of their actions during the decision-making process. *Environmental Defense Fund, Inc. v. Corps of Engineers,* 470 F.2d 289 (8th Cir.) *cert. denied,* 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1972). Substantive requirements have been found in Section 101 of the Act and procedural requirements in Section 102. *Environmental Defense Fund, Inc. v. Corps of Engineers,* 492 F.2d 1123 (5th Cir. 1974); *Calvert Cliffs', supra.*

The distinction between substance and procedure is important when viewed in terms of the Court's power to review agency action. When an attack is made upon an agency's decision to proceed with a particular project Court review is very limited. *EDF v. COE,* 492 F.2d at 1139. As stated by Judge J. Skelly Wright in *Calvert Cliffs'* at page 1112:

Thus the general substantive policy of the Act is a flexible one. It leaves room for a responsible exercise of discretion and may not require particular substantive results in particular problematic instances.

■ NEPA does not require that a particular decision be reached, but only that all environmental factors be explored prior to reaching that decision. *Scenic Hudson Preservation Conference v. Federal Power Commission,* 453 F.2d 463 (2d Cir. 1971). The substantive decision of the agency is unreachable under NEPA as long as the agency does not abuse its discretion and its decision is not arbitrary. *Calvert Cliffs', supra.*

On the other hand whether or not an agency fulfilled the procedural requirements of Section 102 is much more susceptible to Court review. "Section 102 duties are not inherently flexible. They must be complied with to the fullest extent . .." *Calvert Cliffs'* at 1115. In summarizing the review available under both sections the Court in *Calvert Cliffs'* stated at page 1115:

We conclude, then, that Section 102 of NEPA mandates a particular sort of careful and informed decisionmaking process and creates judicially enforceable duties. The reviewing courts probably cannot reverse a substantive decision on its merits, under Section 101, unless it be shown that the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental values. But if the decision was reached procedurally without individualized consideration and balancing of environmental factors—conducted fully and in good faith—it is the responsibility of the courts to reverse.

■ Although the standard imposed upon defendants is more stringent as to procedural matters, a number of courts have emphasized that NEPA does not require perfection in an EIS. In *Natural Resources Defense Council v. Morton,* 148 U.S.App. D.C. 5, 458 F.2d 827 (1972), the District of Columbia Circuit Court stated that NEPA does not impose unreasonable requirements, but calls only for true consideration of alternatives as realistic possibilities:

So long as the officials and agencies have taken the "hard look" at environmental consequences mandated by Congress, the

court does not seek to impose unreasonable extremes or to interject itself within the area of discretion of the executive as to the choice of the action to be taken. 458 F.2d at 838.

The analysis of *NRDF v. Morton* was further amplified by the Eighth Circuit in *Environmental Defense Fund v. Corps of Engineers, supra.* The Eighth Circuit also emphasized the fact that the EIS cannot be expected to be perfect, quoting the language of the lower court opinion that:

> [i]t is doubtful that any agency, however objective, however sincere, however well-staffed, and however well-financed, could come up with a perfect environmental impact statement in connection with any major project. Further studies, evaluations and analysis by experts are almost certain to reveal inadequacies or deficiencies. 470 F.2d at 297.

Thus, the Eighth Circuit rejected the notion that an EIS must be perfect; it substituted instead the notion that the decision maker must note all arguments and understand the serious environmental effects of all alternatives, calling for "good faith objectivity rather than subjective impartiality." 470 F.2d at 296. The Fifth Circuit has endorsed the standard of "good faith objectivity" enunciated by the Eighth Circuit, in *EDF v. COE, supra,* in *Sierra Club v. Lynn,* 502 F.2d 43 (5th Cir. 1974). In light of these cases, the court must not hold an EIS to a standard of perfection; NEPA calls for a "hard look" at alternatives, taken in "good faith objectivity."

Plaintiffs' attack in the instant cases is based on the procedural requirements of Section 102 and as to the substantive decision only to the extent that it was based upon an insufficient EIS. However, it is important to note that an adequate EIS is only part of the total procedural process imposed by Section 102, which requires all agencies to:

(A) Utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) Identify and develop methods and procedures, in consultation with the Counsel on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) Include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

.    .    .    .    .

(D) Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources

.    .    ..

NEPA § 102(2), 42 U.S.C. § 4332(2).

Plaintiffs' attack on the procedures is limited to subsections (A), (C) and (D). What is required by the defendants to comply with these subsections, and especially with the EIS, can be determined by looking at a number of factors.

The timing of an EIS is an important consideration. The policy behind the Act, of course, is that federal agency officials would consider environmental effects of a project *before* it is commenced. *City of*

*Boston v. Volpe,* 464 F.2d 254 (1st Cir. 1972). In fact, the EIS should occur prior to an agency's commitment to a project. *E.D.F. v. C.O.E., supra.* (5th Cir.) Of course, a project must be of sufficient definiteness before a valid EIS can be made. *Upper Pecos Association v. Stans,* 452 F.2d 1233 (10th Cir. 1971). The balance to be struck has been articulated to be:

Statements must be written late enough in the development process to contain meaningful information, but they must be written early enough so that whatever information is contained can practically serve as an input into the decision making process.

*Scientists' Institute for Public Information v. Atomic Energy Commission,* 156 U.S. App.D.C. 395, 481 F.2d 1079, 1094 (1973).

Of utmost importance in ruling upon the NEPA issues presented to the Court is a determination of the proper scope of the EIS. Stated differently, are the requirements of NEPA fulfilled by a systemwide EIS or does NEPA require a separate statement to be done on individual units within the MARTA System?

While the preparation of an EIS over an overly broad project may cause an inadequate and sketchy treatment of the environmental aspects of a project, problems also arise if a project is segmented into overly narrow portions. This can lead to the evaluation of segments in isolation of one another and create a misleading impression of the environmental aspects of a project. *See Ecology Center of Louisiana, Inc. v. Coleman, supra.*

In an effort to articulate a test for the proper scope of an EIS, courts have enunciated a number of principles. The first of these is to look to the purpose or goals of the project. Basically, the test is a negative one; if the segment selected for evaluation within the EIS does not accomplish the purposes of the overall project, the segment being evaluated is too narrow. Only if the unit selected for evaluation has an independent purpose, or if it accomplishes the goals for which it was intended, can the benefits of the project be evaluated and weighed against all environmental aspects or results of the project.

In *Committee to Stop Route 7 v. Volpe,* 346 F.Supp. 731 (D.Conn.1972), the court considered the appropriate unit of an expressway for environmental evaluation. Stating that the major objective of the project governs the unit selected for evaluation, the court held that since planners desired to connect two cities, the span between the cities would be an appropriate unit. 346 F.Supp. at 740. Likewise, in *Sierra Club v. Callaway,* 499 F.2d 982 (5th Cir. 1974), rejecting the contention that the appropriate unit for evaluation was not the Wallisville project (a dam at the mouth of the Trinity River in Texas), but the entire Trinity project (a navigation and flood control project extending along 363 miles of the Trinity River), the Fifth Circuit held that the Wallisville project alone had separate independent purposes, none of which related to or was dependent on the larger project.

A second related principle is whether or not the scope of the EIS covered a separate viable entity. In *Sierra Club v. Callaway, supra,* the Fifth Circuit emphasized the fact that the Wallisville dam was an independent, useful project even if isolated from the entire Trinity River navigation project:

Wallisville is a separate viable entity. It should be examined on its own merits. Although it has been made compatible in certain of its features with Trinity it is not a mere component, increment, or first segment of Trinity. 499 F.2d at 990.

In reaching its decision, the Fifth Circuit drew upon the reasoning of two highway cases in which it had been held that the segment of highway evaluated in an EIS must have an independent utility of its own; it cannot be an arbitrarily truncated section of expressway which cannot be used unless adjoining sections are also built. *Indian Lookout Alliance v. Volpe,* 484 F.2d 11 (8th Cir. 1973); *Named Individual Members of the San Antonio Conservation Society v. Texas Highway Department,* 446 F.2d 1013 (5th Cir.), *cert. denied,* 403 U.S. 932, 91 S.Ct. 2257, 29 L.Ed.2d 711 (1971).

Finally, it has been indicated that the unit studied must be of sufficient scope that alternative courses of action within the segment studied are possible. The purpose of NEPA's requirement of study of alternatives is to permit a balancing of environmental costs and benefits against economic and social costs and benefits for each alternative studied. If a project is piecemealed, placement and configuration of each unit is evaluated in isolation from all others, and evaluation of the overall impact of the system becomes impossible.

For example, in *Named Individual Members of the San Antonio Conservation Society v. Texas Highway Department, supra,* a case involving a freeway which had been divided into three segments, the middle one of which passed through protected park lands, the Fifth Circuit recognized the ultimate effect of allowing such piecemealing in environmental studies:

> The frustrating effect such piecemeal administrative approvals would have on the vitality of section 4(f) [of the Department of Transportation Act of 1966] is plain for any man to see. Patently, the construction of these two "end segments" to the very border, if not into, the Parklands, will make destruction of further parklands inevitable, or, at least, will severely limit the number of "feasible and prudent" alternatives to avoiding the Park. 446 F.2d at 1023.

While the Court reached its result under § 4(f) of the Department of Transportation Act, the effect of segmentation under NEPA is exactly the same—the impossibility of complying with the requirement that alternative proposals be evaluated. The same reasoning was employed in *Committee to Stop Route 7 v. Volpe, supra,* in which the Court stated:

> With respect to a proposed highway, consideration of alternatives has two dimensions: an initial choice between building the highway or relying on existing routes or alternate means of transportation, and a subsequent choice among various alternative routes and designs. Consideration of the environmental impact of a small

segment of a proposed route makes impossible adequate consideration of either set of choices. Alternatives to building an expressway are not brought into focus when consideration is given to just one segment. Moreover, placement of one segment tends to narrow the range of choices for placement of the remainder of the entire highway, thereby precluding adequate consideration of alternative routes. 346 F.Supp. at 740.

■ The requirement of considering alternatives to proposed action is expressed both in subsection (C) and subsection (D) of Section 102. Courts have consistently reiterated that discussion of environmental alternatives need not be exhaustive, but discussion is sufficient if it "permit[s] a reasoned choice of alternatives so far as environmental aspects are concerned." *NRDC v. Morton, supra,* at 836. The discussion of alternatives found in subsection (D) is in addition to the need to discuss alternatives in the EIS. *EDF v. COE, supra.*

■ The Court feels that to a large extent the reasonableness of and sufficiency of discussion of alternatives in the EIS is governed by the scope of the EIS. In other words, alternatives should be geared to alternatives to the entire project covered by the EIS and not necessarily to individual components within the project. It is certainly not reasonable to expect an agency to conceive of every alternative to every component in a large government financed project. The treatment of alternatives must be in accordance with a rule of reason. *Sierra Club v. Lynn,* 502 F.2d 43, 62 (5th Cir. 1974). The Court believes that, as planning continues on a project, there is a definite requirement under subsection (D) to continue to review environmental impact of alternatives. *Cf. NRDC v. Morton, supra.* During this continuing review agencies and interested parties are in a better position to consider alternatives to finite components of a particular project.

■ In summary, procedural compliance with NEPA can be found if an administrative agency, prior to committing federal funds to a project, utilizes a "systematic,

interdisciplinary approach" to evaluate the environmental impact of a project and prepare an EIS which covers a unit which has an independent purpose, and in which reasonable alternatives to the unit covered by the EIS are discussed. In addition, an agency should continue to be alert to environmental problems even after the preparation of an EIS and institute a continuing review of alternatives as irreconcilable environmental problems arise.

■ With this general standard in mind, the Court concludes none of the plaintiffs have shown to the Court that their claims under NEPA should be sustained. The meat of these claims is that the EIS conducted by the federal defendants did not sufficiently consider alternatives to the Moreland Avenue Station, the Decatur Station, or the alignment of tracks down Sycamore Street. Plaintiffs request that the defendants be required to supplement or conduct a new EIS prior to taking any further action. In the Court's view, however, the present EIS is adequate, especially when considered as a statement over the entire MARTA System.

The Court concludes that NEPA procedurally requires an EIS over the entire MARTA System and that such a study had to be done before the federal defendants had authority to commit any federal funds to the financing of MARTA. Any EIS over less than the entire system, or more especially over individual stations would have been contrary to the requirements of NEPA.

Looking at the overall purpose of the MARTA project, it is clear that an individual station does not have an independent purpose of its own. In addition it is apparent that a station is not a "separate viable entity" and that an individual rapid transit station in isolation has no independent utility of its own. It only becomes functional when connected with other stations in a complete rail network. EIS on separate stations would greatly restrict the possibilities of alternatives. Alternative locations of one individual station have an impact upon all other stations on the line, for placement of the station is governed in part by the speed of the train, acceleration, and deceleration. Furthermore, placement of the station is affected by major traffic arteries, population concentrations, not to mention a variety of other factors. It is axiomatic that the lateral displacement of a station (to the north or south of the East Line rail corridor) will affect the placement of the rail corridor itself. As a result, evaluation of each individual station in isolation becomes not only impractical but impossible. The beneficial impact of altering the location of one station may be totally counterbalanced by the detrimental impact of the ripple effect because the changes in station location are felt in each direction along the line. Thus, evaluation of each individual station, far from advancing the purposes of NEPA, would actually defeat its purposes. A new review such as suggested by some of the plaintiffs "smacks of trying to dump the problem into someone else's backyard." *Town of Groton v. Laird*, 353 F.Supp. 344, 351 (D.Conn.1972).

When the scope of the MARTA EIS is properly viewed as being over the entire system, the Court cannot find that the EIS did not sufficiently cover reasonable alternatives to the system. When in the process of making the decision as to whether or not to fund the MARTA project, the federal defendants had available to them an EIS which contained a detailed discussion of nine alternatives to the system. These alternatives included the basic all-rail system, the original rail system, the extended all-bus system, the busway/rail system, the busway/distributor system, the modified busway/rail systems, the commuter railroad system, and the "no-build system." These alternatives provided the federal defendants with ample opportunity to evaluate and consider the relative merit of the approved system over reasonable alternatives to that system. The Court can find no evidence that the federal defendants abused any discretion in rejecting the alternatives and approving MARTA's grant.

In addition, to the required alternatives over the entire system, the MARTA EIS

discussed numerous alternatives to routes and alignments when identifiable problems had arisen at the time of the writing of the EIS. Included in these alternatives is a discussion of the railroad alternative to the Decatur Station. This discussion placed before the federal defendants a comparison of the environmental impact of both the present Decatur alignment and the alternative railroad alignment. Although, the Moreland Avenue Station was not scrutinized specifically in the discussion of alternatives, the EIS does state that the Moreland Avenue Station would be subjected to further environmental study.

One of the problems with the detailed study of alternatives to each of the stations as proposed by the plaintiffs is the problem with timing. An EIS had to be prepared prior to a commitment by the federal defendants to the MARTA project. As a practical matter, however, the MARTA project as now envisioned, probably would not be built without the guarantee of federal money. The problem, therefore, is to prepare an EIS at a point where sufficient details are known but before great sums of public funds are spent on a project no one is sure can ever be completed because of the uncertainty over federal financing. The detail plaintiffs desire to be put into the EIS would require a statement to be written only after much of the specific engineering on each station had been completed. Yet, the more money spent on detailed planning, the more difficult it would be objectively to weigh the alternative of building or not building the system. One of the main thrusts of NEPA is that such a decision should be made before great expenditure of money.

■ Plaintiffs also contend that even if the original EIS is found sufficient by the Court the federal defendants should be required to do a supplemental EIS on the various stations. As argued by Inman Park, the engineering design of the Moreland Park Station is now 30% completed and consequently there is now more definite information on which to evaluate the impact of that station.

NEPA itself does not mention the preparation of a supplemental EIS. The only basis for the preparation of a supplemental EIS is found in the Department of Transportation [DOT] Order 5610.1B, 39 Fed.Reg. 35234 (Sept. 30, 1974) which provides as follows:

> Supplemental or amended statements. Department officials may supplement or amend a draft or final environmental impact statement. When substantial changes are made in a proposed action, or where significant new information regarding its environmental impacts comes to light, the operating administration should secure the concurrence of TES as required under subparagraph 9c. In any case the operating administration should consult with CEQ [Council on Environmental Quality], through TES, with respect to the need for, or desirability of, recirculating the statement for the appropriate period.

Plaintiffs argue that substantial changes have been made in the station plans for the Moreland Avenue Station thus requiring the preparation of a supplemental EIS. Furthermore, they contend that the more complete development of the station plans of both the Moreland and Decatur Station which has taken place comprises significant new information which requires the preparation of supplemental statements. What the plaintiffs are really urging is that a new EIS be prepared on each station at each level of planning development for that station. This is not what was contemplated by the enactment of NEPA, and if allowed, it would effectively prevent the future construction of any rapid transit system or other complex federally funded project.

As has been stated above, the preparation of an EIS pursuant to NEPA is to be done at the early planning stages of a project of independent utility. The early stages at which the EIS must be done of necessity contemplates that all detailed planning for each component of the project unit will not have been completed at that time. Nevertheless, there is no requirement within NEPA for the preparation of a supplemen-

tal EIS. Instead NEPA requires a continuing interdisciplinary approach and continuing studies of alternatives in order to assure the proper integration of environmental concerns with economic and technical considerations throughout the project's development.

The Court apprehends that, considering the purposes of NEPA, the continuing program envisioned is far more desirable than a "one-shot," "two-shot," or "several-shot" EIS which, having been accomplished, would amount to license to build with no further environmental concern. The environmental impact is revealed in the EIS. Yet the decision to fund the project is no mandate that the impact not be deflected, lessened, changed, re-directed, tuned, soft-pedalled, muted, sharpened or flattened from place to place when, from time to time, as plans and work progress such opportunities appear. Plaintiffs' view of an EIS seems to be a "locked in" view. The project would be subject to a new EIS whenever, during engineering and construction, any new insights were revealed. It would seem to follow that between the creation of Environmental Impact Statements the project could move relentlessly forward with no consideration given to desirable minor modifications which might easily accommodate the needs of some, a few, or even one affected person. Such a view might best serve the wishes of those opposed to the project in its entirety. The view that the pre-funding EIS discloses the impact and continuing studies deal best with that impact from time to time and place to place best serves the intent of the law makers.

To prevent major changes which would substantially change the impact of the entire project, DOT issued the Order quoted above, in which it allows for the preparation of supplemental statement in such case. A common sense reading of this Order would indicate that the preparation of such a supplement is an unusual occurrence to be done only in cases in which "*substantial* changes are made in the *proposed action* or where *significant* new information

regarding *its environmental impacts* comes to light  . . .." [emphasis added]. This means that a supplement is contemplated only when there has been a significant change in the entire project on which the EIS was prepared or when significant new information has arisen which changes the environmental impact of the entire project. This is not the situation here. The continuing development of station plans, certainly is not of a magnitude to require the preparation of a supplemental EIS. Furthermore, the deletion of I/485, a change which is outside the scope of the project, does not cause a substantial change in the MARTA System. The MARTA project remains the same with only a minor shifting of the Station along the railroad tracks and a decrease in the number of parking spaces to be made available at the station. This "new information" and the minor changes occasioned thereby clearly do not cause a substantial change in the impact of the System so as to require a supplemental EIS on the Moreland Avenue Station.

The plaintiffs in the SOS suit contend that a supplemental EIS is required since it has been learned since the approval of the EIS that the construction of the Decatur Station will require MARTA to obtain a permanent underground easement under the old DeKalb County Courthouse Square, and that the Advisory Council on Historic Preservation has declared Sycamore Street eligible for inclusion on the National Register of Historic Places. Although this information does require UMTA and MARTA to follow procedures pursuant to Section 106 of the National Historic Preservation Act and 4(f) of the Department of Transportation Act, they can hardly be considered significant new information which would change the impact of the rapid transit project as a whole and would require the preparation of a supplemental EIS on the Decatur Station.

The *impact* has not changed. The environment upon which the impact operates has not changed. The only change is in the official classification of structures compris-

ing a part of that environment. Section 106 of the National Historic Preservation Act and Section 4(f) of the Department of Transportation Act deal approximately and uniquely with this change in official recognition. No new impact appears so no new EIS seems required.

A review of the MARTA EIS conclusively shows that it is in full compliance with the procedural requirements of Section 102. The EIS is the result of an interdisciplinary approach to environmental problems that arise out of the construction of this rapid transit system. The EIS, as required by NEPA, was prepared before federal approval of the project, and it sets forth detailed alternatives to the construction of the proposed MARTA System as well as the environmental consequences of the proposed system. The discussion of these alternative systems was lengthy and detailed, and it incorporated by reference earlier studies in which the various alternatives had been studied at great length. Furthermore, as to the system-wide impact, the EIS contains detailed analyses of the ecological, historical, acoustical-visual, economic, land use, air quality, water quality, solid waste and social impacts of the system. In addition, unavoidable long and short-term adverse environmental impacts, community service impacts and relocation impacts were discussed. The three volume, 2485 page EIS also summarized and incorporated the factors considered and the conclusions reached in the decade of planning which culminated in its preparation.

Although NEPA contemplates a less detailed discussion of individual components and alternatives, MARTA's planning process, as well as the EIS itself have gone beyond the requirements of NEPA. Specific references are made in the EIS to the Moreland Avenue and Decatur Stations. For example, land use impacts, long-range consequences, property effects, neighborhood impacts, community service impacts, relocation impacts, historic impacts, economic impacts, visual impacts, ecological impacts, water resource impacts and alternative location plans for the Decatur Sta-

tion are all specifically discussed in the EIS. Likewise, specific references to business and neighborhood impacts, visual impacts, unavoidable adverse impacts, land use and station impacts, impacts on educational facilities, impacts on parks and recreational facilities, ecological impacts, territorial impacts, water resource impacts and alternatives for the Moreland Avenue Station are discussed in the EIS. Moreover, much of the discussion of the system-wide impacts are applicable to both the Decatur and Moreland Avenue Station although specific references may not have been made to those stations.

From the foregoing, it is abundantly clear that the MARTA EIS contains an extensive analysis and consideration of system-wide impacts and alternatives as required by NEPA. Furthermore, it is evident that MARTA's EIS goes beyond the requirements of NEPA in specifically analyzing and considering impacts on specific stations and specific alternatives thereto. Thus, the plaintiffs are not entitled to relief on the basis of the inadequacy of MARTA's EIS.

Finally, it should be noted, that the environmental evaluation of the MARTA System did not terminate upon completion of the EIS. The EIS itself refers to the Transit Station Area Development Studies [TSADS] to be funded by UMTA. These studies, one of which has been done on the Moreland Avenue Station and two of which have been done on the Decatur Station, have been continuing projects involving citizen participation and have resulted in recommendations for the development in and around the stations. Furthermore, since the completion of the EIS numerous studies have been prepared. Among these are several studies which pertain to the Moreland Avenue and Decatur Stations. These include: a Patronage Study on the Moreland Avenue Station; a Patronage Study on the East Line; a study on the shifting of the Moreland Avenue Station; the TSADS Status to Date Study; the 1975 study of Decatur Alternative Alignments; a study on the eligibility of Sycamore Street for the Na-

tional Register; the Moreland Avenue Soil Study; the Decatur Soil Study; a case report on the Decatur Station; a study in response to City of Atlanta's Comments on Moreland Avenue; the Preliminary-in-Progress Report on Decatur Station; the Conceptual Design Report on Moreland Avenue; the five volume EIS Standard and Criteria Study; the Preliminary Design Study Report on Decatur Station; the Preliminary Design Study and Report on Moreland Avenue Station; a study on the National Historic Act Procedures with reference to Inman Park; studies on alternatives to the downtown Decatur alignments; the Wilson Erig Acoustical Study and Report; and a study on the Development of the Decatur Station.

■■■ The law is clear that in judging an agency's compliance with NEPA, the Court must consider all of the requirements of NEPA and not just the sufficiency of the EIS. *Environmental Defense Fund v. Corps, supra.* Furthermore, it is clear that the statements in the EIS are to be augmented by the attachments thereto and the records and studies listed therein. *Life of the Land v. Volpe,* 363 F.Supp. 1171 (D.Hawaii, 1972), *aff'd sub nom. Life of the Land v. Brinegar,* 485 F.2d 460 (9th Cir.); *cert. den.,* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1973). Likewise studies mentioned in the EIS and studies completed after the preparation of the EIS should be considered as satisfying the requirements of 102(2)(A) and (D) NEPA.

In light of the discussion above, it is clear that UMTA and MARTA have complied not only with NEPA's requirements as to the preparation of an adequate EIS but as well with NEPA's mandated development of: an interdisciplinary approach to insure the integrated use of the natural and social sciences; methods and procedures to insure consideration of environmental values; and study and description of appropriate alternatives.

There is a need for NEPA and the EIS it requires. Procedures are instituted to insure that the need is met.

Many apparently worthwhile projects are, today, financed in large part by federal funds. Those charged with responsibility to determine whether or not such projects shall benefit from such funding have heavy responsibilities. Proponents of the projects urge their desirability. Absent any requirement to do so, they are not to be expected to call attention to undesirable impacts from the construction of the projects. Federal officials are often far removed from the site to be affected and must, of necessity, rely upon information furnished with the application for the funds. Thus, in the best of faith and for the best of motives, federal funds might be used to construct a project, worthwhile in its purpose but incidentally *disastrous* to the community.

It appears to this Court that an EIS is required to avoid such accidental financing. Even fully advised, the federal agency may be put to a hard decision. Creating a beneficial project probably involves some measure of undesirable side effect. The EIS is submitted so that, in the environmental area, the agency, put to a hard choice, will at least have the opportunity to come to an informed decision. To the extent that the project will have adverse impact, it will not have been inadvertently authorized, but knowingly authorized.

Some projects have relatively patent environmental impact; for others the impact is more obscure. A four lane highway may be the former. Some exotic chemical plant or nuclear reactor might pose possibilities of impact harder to define or predict. The MARTA project comes between these, probably nearer the former than the latter. Rail and bus transportation have been with us for generations. The nature of expected impact appears initially from the articulation of the scheme of railbeds and stations. Its impact upon uses of land and facilities nearby, but not actually used, is somewhat more obscure. The EIS here evidences that the federal defendants were well informed in both areas before they approved the project.

The national purpose of NEPA has been served and the several contentions of plaintiffs in this regard are without merit.

### OTHER MATTERS

There remain some issues raised by the pleadings but not now ripe for decision. Plaintiffs seek injunctive relief based upon their claims that defendants have not complied with Section 4(f) of the Department of Transportation Act; Section 14(c) of the Urban Mass Transportation Act; and Section 106 of the National Historic Preservation Act.

At the outset of the hearing it was stipulated that the administrative process involved in compliance with these provisions of law was not completed. Indeed, the designation of some property as eligible for inclusion on the Historic Register had only taken place during the pendency of the litigation. Reportedly, steps were then (and, presumably, are now) being taken to comply.

The Court assumes that what is required to be done is being done and that these potential issues will be lawfully resolved at the administrative level. Nevertheless, in an attempt at efficiency the Court took evidence at the hearing which would be pertinent to these potential issues, and reserved to the parties the right to supplement such evidence at the conclusion of the administrative process should such appear desirable. Thus, with the denial of relief sought upon the other (NEPA) issues, all presently before the Court is decided. The record remains open as an efficient and economical vehicle for the resolution of "Historical Preservation" issues if any remain upon termination of the administrative proceedings.

### CONCLUSION

In conclusion, it is the Order of the Court that:

1. Although plaintiffs have raised contentions based upon Section 106, the briefs in opposition to defendants' motion for judgment, do not raise any particular contentions concerning the 106 process. Plaintiffs do not point to any

1. Plaintiffs' request for declaratory and injunctive relief based upon the National Environmental Policy Act is DENIED;

2. All other claims arising under Section 4(f) of the Department of Transportation Act, Section 14(c) of the Urban Mass Transportation Act, and Section 106 of the National Historic Preservation Act are not ripe for determination and are reserved. If plaintiffs feel that any future action taken by defendants is inconsistent with defendants' obligations under the statutes not ruled upon, and if plaintiffs would be irreparably harmed by such action, they may apply to the Court for appropriate temporary relief.

SO ORDERED, this 7th day of November, 1975.

### SUPPLEMENTAL ORDER

On November 7, 1975, the Court entered an order in these cases which denied plaintiffs' declaratory and injunctive relief based upon the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4331 *et seq.* Rulings upon plaintiffs' remaining claims under section 4(f) of the Department of Transportation Act, 49 U.S.C. § 1653(f); section 14(c) of the Urban Mass Transportation Act of 1969, 49 U.S.C. § 1610(c); and Section 106 of the National Historic Preservation Act, 16 U.S.C. § 470 *et seq.* were reserved pending the completion of the administrative process. The parties now agree that the administrative record is complete. They have filed supplemental briefs and plaintiffs contend that defendants have not complied with the requirements of either 4(f) or 14(c).[1]

A full statement concerning the background of the litigation and a description of the parties is found in the Court's previous ruling. It is sufficient here to reiterate only that plaintiffs Inman Park Restoration, Inc. (Inman Park) and certain individ-

specific deficiencies in defendants' procedural compliance with 106, nor are the substantive agreements attacked. Consequently, the Court concludes that defendants have complied in all respects with the provisions of Section 106.

uals in Civil Action No. 75–717 are contesting defendants' actions as they relate to the building of the East Line of the MARTA System in the area of Inman Park and in particular the building of the Moreland Avenue Station. Plaintiffs Save our Sycamore and Donald H. Mahaffey are concerned solely with defendants' actions as they affect the Old DeKalb County Courthouse and the Sycamore Street historic area, also on the East Line of the System. (Civil Action No. 75–928).

## I. FINDINGS OF FACT

1. The administrative procedures in question have been completed, and the 4(f) Statements, 14(c) Statements and 106 Memoranda of Agreement have been tendered to the Court and admitted into evidence.

2. The Old DeKalb County Courthouse was placed on the National Register of Historic Places [National Register] on August 26, 1971.

3. Construction of MARTA's Decatur Station will require a permanent sub-surface easement of approximately 32 feet by 230 feet from the south side of the Courthouse Square and temporary construction easements on an additional parcel approximately 37 feet by 230 feet. The Courthouse structure itself will not be affected by the construction of the Decatur Station.

4. After the determination was made that the construction of the Decatur Station would affect the DeKalb County Courthouse, the Urban Mass Transportation Administration (UMTA) prepared and sent a preliminary case report describing the effects of the project on the Courthouse to the Advisory Council on Historic Preservation [Advisory Council]. At the same time, UMTA requested that the Advisory Council comment on the project pursuant to the procedures for compliance with section 106 set forth in 36 CFR, Part 800.4(e).

5. On June 4, 1975, a consultation took place among representatives of the Advisory Council, the Georgia State Historic Preservation Office of UMTA to assess the effect which the MARTA construction would have on the Courthouse grounds and to discuss feasible alternatives by which to avoid or mitigate any adverse effects which might result. At that meeting, several mitigating measures were agreed upon; however, MARTA was asked to develop an alternative design for the station's entranceway.

6. On June 19, 1975, another consultation on the DeKalb County Courthouse took place at which MARTA's consulting architect presented several design alternatives. After discussion and study, a design which modified the station's entranceways, provided for the protection of the Courthouse and surrounding trees during construction, and resulted in an increased area of grass for the Courthouse lawn was agreed upon satisfactorily to mitigate any adverse effects which the project might have on the Courthouse.

7. The UMTA Administrator formerly determined that the agreed upon proposal to mitigate harm to the DeKalb County Courthouse included all possible planning to minimize harm to this historic site.

8. A Memorandum of Agreement completing the 106 process on the DeKalb County Courthouse was signed in June, 1975 by the Chairman of the Advisory Council, the Executive Director of the Advisory Council, the Administrator of UMTA and the Georgia State Historic Preservation Officer.

9. At the request of interested citizens, including one of the attorneys for the SOS plaintiffs, UMTA requested a determination by the Department of the Interior of the eligibility for inclusion in the National Register of the Victorian era houses on Sycamore Street in Decatur, Georgia.

10. On August 18, 1975, the Director of the Office of Archaeology and Historic Preservation in the Department of Interior informed UMTA that Sycamore Street, from North Candler Road to Glenn Street in Decatur, Georgia, was eligible for inclusion in the National Register.

11. The construction of the MARTA Line east of the Decatur Station will have an adverse effect on the Sycamore Street

historic district as it will require several full and several partial acquisitions from this area.

12. After the determination of Sycamore Street's eligibility for inclusion in the National Register, UMTA prepared and sent to the Advisory Council a preliminary case report describing the effects of the MARTA project on the district and setting forth alternatives to avoid or mitigate the adverse effect on the project. At the same time, UMTA requested that the Advisory Council comment on the project pursuant to 36 CFR, Part 800.4(e).

13. Consultation on the Sycamore Street district began on August 25, 1975, among representatives of the Advisory Council, the Georgia State Historic Preservation Office and UMTA to assess the effect which the construction of the MARTA Line would have on the Sycamore Street historic district and to discuss feasible alternatives by which to avoid or mitigate any adverse effect which might result. The alternatives which were discussed included: (1) a Columbia Drive alignment, which by-passed the residences in question on Sycamore Street, but which required the taking of other residences, including the Williams-Evans house, which has been determined to be eligible for inclusion on the National Register of Historic Places, and a portion of the Decatur Recreation Center's front yard; (2) the extension of the subway, which would take the same residences as the presently proposed alignment, and would cost about $4.5 million dollars more; and (3) the construction of a retaining wall to act as a buffer. This third alternative was adopted by MARTA. At that same consultation, it was determined that although numerous meetings had been held with the citizens to discuss the Sycamore Street situation, another public information meeting should be held to gain citizen views and insight into the effect of MARTA on the Sycamore Street district.

14. A well publicized public information meeting, called by the City of Decatur, took place in Decatur on September 2, 1975. Approximately 200 interested citizens from Decatur, the Mayor of Decatur, a staff member of the Advisory Council, the Georgia State Historic Preservation Officer, an UMTA representative, and a MARTA representative attended that meeting. Additional alternative alignments which would require the removal of the Decatur Station from its downtown location were inquired into at that meeting. Those alternatives were studied further after the meeting and were set out in detail in the proposal to mitigate the adverse effect of the MARTA Line on the Sycamore Street historic district which was prepared by UMTA in October, 1975.

15. Throughout the consultation process, MARTA held additional discussions with citizens in the Sycamore Street area in an effort to further mitigate the impact of the project. As a result of these discussions an additional proposal was agreed upon by which three of the eight houses originally scheduled for demolition would be preserved. This proposal included the preservation of the Mahaffey house in its present location, the moving of the Red Cross house and the Death house, the building of a stone-faced wall behind these houses so as to provide a continuous visual and acoustical barrier from the subway portal most of the way to the Avondale Station and the relandscaping of any additional vacant space in this area and its donation to the City of Decatur for use as a park.

16. A Memorandum of Agreement concluding the 106 process on the Sycamore Street historic district was signed in December, 1975, by the Chairman of the Advisory Council, the Executive Director of the Advisory Council, the Administrator of UMTA and the Georgia State Historic Preservation Officer.

17. A combined 4(f) Statement on the DeKalb County Courthouse and the Sycamore Street historic district was signed by the UMTA Administrator on January 2, 1976.

18. The 4(f) Statement on the DeKalb County Courthouse and the Sycamore Street district and the documentation attached thereto present a detailed discussion

of alternative rail alignments and station locations for the Decatur Station and the rail alignment east therefrom. As set forth in those documents each of the alternative rail alignments and station locations considered for the Decatur Station and the rail alignment eastward therefrom present uniquely difficult problems in terms of engineering feasibility, development goals of the City of Decatur, community disruption, impacts on schools and recreational areas, relocation and the use of other historic properties.

19. The 106 Memorandum of Agreement and the 4(f) Statement prepared on the DeKalb Courthouse and the Sycamore Street historic district and the documents attached thereto as well as the administrative record supporting those determinations present detailed discussion of the impacts created by the MARTA projects in question and all possible methods by which to mitigate those impacts.

20. The Inman Park historic district was placed on the National Register in 1973 after the approval of MARTA's Environmental Impact Statement (EIS). Thereafter, it was determined that the relocation of DeKalb Avenue associated with the construction of the MARTA East Line would have an effect on this historic district.

21. The relocation of DeKalb Avenue associated with the construction of MARTA's East Line will require the use of a small portion of the Inman Park historic district. This use will result in the demolition of part or all of three buildings on the edge of the district which are in poor repair and the taking of several small strips of property from the edge of the district.

22. After the determination was made that the construction of MARTA's East Line would affect the Inman Park historic district, UMTA prepared and sent a preliminary case report describing the effects of the project on the district to the Advisory Council. At the same time, UMTA requested that the Advisory Council review this MARTA project pursuant to the procedures for compliance with Section 106 set forth in 36 CFR, Part 800.4(e).

23. In February, 1975, consultation took place among the representatives of the Advisory Council, the Georgia Historic Preservation Office, UMTA, and a representative of MARTA to assess the effect of MARTA's construction on the Inman Park historic district and to discuss feasible alternatives by which to avoid or mitigate any adverse effects which might result.

24. In February, 1975, additional meetings were held between citizens of Inman Park and representatives from UMTA, MARTA, and the Georgia Historic Preservation Office, and an onsite inspection was conducted by representatives of UMTA and the Georgia Historic Preservation Office.

25. After a comprehensive investigation of the potential adverse effects on the Inman Park District had been completed, a proposal to mitigate those effects was sent to the Advisory Council by UMTA.

26. The Advisory Council carefully reviewed the proposal in Inman Park, held further consultations with representatives from MARTA, UMTA and the State Historic Preservation Office, and drafted an amendment to the original proposal.

27. The Advisory Council concluded that the proposal submitted by UMTA together with the Advisory Council's amendment satisfactorily mitigated any adverse effects the MARTA project might have on the Inman Park historic district.

28. In August, 1975, a Memorandum of Agreement concluding the 106 process on Inman Park was signed by the Chairman of the Advisory Council, the Executive Director of the Advisory Council, the Georgia State Historic Preservation Officer, the Administrator of UMTA and MARTA's General Manager.

29. The 4(f) Statement on Inman Park was signed by the UMTA Administrator on November 18, 1975. That statement is a 54 page document which includes a detailed discussion of specific impacts on the Inman Park district, suggested mitigation of those impacts and possible alternatives to avoid the use of property from the district. The alternatives considered in that document

included locating the MARTA tracks south of the existing railroad tracks; locating the MARTA tracks closer to the existing railroad tracks; and not building the rail line in this area at all.

30. The 4(f) Statement on Inman Park points out that each of the available alternatives to the use of property from the Inman Park historic district present uniquely difficult problems in that they would require: more relocation than the adopted alignment; more disruption to the area; the taking of the same structures and properties from the historic district; the impacting of a cemetery; or they were not engineeringly feasible.

31. The 106 Memorandum of Agreement and the 4(f) Statement prepared on the Inman Park historic district and the documents attached thereto as well as the administrative record supporting those determinations present detailed discussions of the impacts created by the MARTA project and methods by which to mitigate those impacts.

32. The administrative record is replete with references to continuing input by the City of Atlanta and the members of the Inman Park Community to the planning process.

33. The 106 Memorandum of Agreement on Inman Park was signed in September, 1975 and the Section 4(f) Statement was signed on November 18, 1975. There was a letter from Leon Eplan to William T. Coleman asking that the City have an opportunity to review the 4(f) Statement which was dated November 21, 1975 after the 4(f) Statement and 106 Memorandum of Agreement had been prepared and signed.

34. The "no build" alternative which was considered in the 4(f) Statement on Inman Park consisted of not building MARTA's East Line rather than not building the Moreland Avenue Station. The Moreland Avenue Station is located east of the Inman Park historic district and the construction of that Station does not require the use of any property from the Inman Park district. Rather, the taking of property from Inman Park is the necessary result of the reloca-tion of DeKalb Avenue which, in turn, is the necessary result of the construction of MARTA's East Line.

35. In the instant case, the Section 106 Memorandum of Agreement and the Section 4(f) Statement set forth detailed measures by which to mitigate harm to the Inman Park historic district. These measures included not only proposals which involve impacts fully known at the present stage of design and construction, but also an agreement by UMTA continually to monitor the planning of the Station so as continually to assure that all possible planning to minimize harm to Inman Park be accomplished.

36. A Section 14(c) determination requires the finding that: (1) adequate opportunity was afforded for the presentation of views by all parties with a significant economic, social, or environmental interest, and fair consideration was given to the preservation and enhancement of the environment and to the interest of the community in which the project is located and (2) either no adverse environmental effect is likely to result from the project or there exists no feasible and prudent alternatives to such effect and all reasonable steps have been taken to minimize such effect.

37. On December 30, 1975, after the preparation of the Section 4(f) Statements on the Inman Park historic district, the DeKalb County Courthouse and the Sycamore Street historic district, a supplemental Section 14(c) determination dealing specifically with those areas was signed by the UMTA Administrator. That statement incorporated the 4(f) determinations made on the Inman Park historic district, the DeKalb County Courthouse, and the Sycamore Street historic district and the administrative record underlying those determinations to find that: (1) adequate opportunity was afforded for the presentation of views by all parties having a significant economic, social or environmental interest in the project, and fair consideration has been given to the preservation and enhancement of the environment and to the interest of the communities in which the historic areas are located; and (2) although there exists some

adverse environmental effect on these historic areas as a result of these projects, no feasible and prudent alternative to such effect exists; and, all reasonable steps have been taken to minimize such effects.

38. The same factual basis underlies the Section 106, 4(f) and 14(c) determinations on the Inman Park historic district, the DeKalb County Courthouse and the Sycamore Street historic district. For that reason, the facts regarding the Section 106 and 4(f) findings on these historic areas are incorporated by reference as the factual basis on which the 14(c) determinations were made.

## II. CONCLUSIONS OF LAW

### A) SECTION 4(f) DETERMINATIONS

■ Section 4(f) provides:

It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After August 23, 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.

The Secretary of Transportation has delegated the authority to carry out the functions vested in him in section 4(f) to the Administrator of the agency involved in approving the use of lands sought to be preserved by the Act. 49 C.F.R. Part 1.45(4).[2] In the instant case this authority is vested in the Administrator of UMTA.

Pursuant to this authority on November 18, 1975 the Administrator of UMTA made the 4(f) determination with respect to the Inman Park historic district. He found that "there are no feasible and prudent alternatives to the use of [Inman Park] land, and that all possible planning has been done to minimize harm to this historic site." [D–89, p. 1]. The 4(f) process was completed as to the DeKalb County Courthouse and the Sycamore Street historic district on January 2, 1976, when the Administrator signed a similar statement concerning these areas. Both Inman Park and SOS attack the substantive decisions made in these determinations, and, in addition, Inman Park attacks the alleged failure of UMTA to allow all interested parties to have an input into the decision making process.

Section 4(f) prohibits the use of federal funds where, in this instance, the MARTA project would require the use of an historic site except where there is (1) "no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm" to the used land. The seminal opinion construing section 4(f) is the Supreme Court ruling in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The Court in *Overton Park* defined a feasible alternative as one that is engineeringly feasible and a prudent alternative is one that presents no "unique problems."

Once the 4(f) procedure is completed, however, actual review by the Court is narrow. The 4(f) determination carries with it a presumption of regularity and this Court is not empowered to substitute its judgment for that of UMTA. *Citizens to Preserve Overton Park v. Volpe, supra.* The stan-

2. Plaintiffs do not contest the validity of the    delegation of this authority.

dard of review set out in *Overton Park* is basically a three-fold test. The Court must find (1) that the agency acted within the scope of its authority and could have reasonably believed that there were no feasible and prudent alternatives to the approved action; (2) the decision was based upon the consideration of relevant facts, involved no clear error in judgment and was not arbitrary, capricious and an abuse of discretion; and (3) the action followed the necessary procedural requirements. *Citizens to Preserve Overton Park v. Volpe, supra* at 414–416, 91 S.Ct. at 822–823, 28 L.Ed.2d at 151–153. *See also Brooks v. Coleman*, 518 F.2d 17 (9th Cir. 1975); *Concerned About Trident v. Schlesinger*, 400 F.Supp. 454 (D.D.C.1975).

In other words to uphold the Administrator's 4(f) determination, the Court must find that the Administrator, after allowing for input from all interested parties and after reviewing all relevant information, could have reasonably concluded that there was no engineeringly feasible alternative to the planned use of the land from the historic districts or that alternatives, engineeringly possible, presented uniquely difficult problems. To find that the Administrator acted in an arbitrary and capricious manner the Court must find that the decisions were not based on a consideration of the relevant facts and that there had been a clear error in judgment.

In a sense it would appear that the same dichotomy exists in reviewing the 4(f) statement as exists in reviewing the Environmental Impact Statement. As discussed in the Court's previous order, while a review of the agency's substantive decision is narrow the Court must closely scrutinize the procedural steps taken in formulating a decision to ascertain whether or not they complied with the applicable statute.

### 1. *The Inman Park 4(f) Statement*

The main thrust of Inman Park's attack on the 4(f) statement is that the City of Atlanta, clearly an interested party, was not given an opportunity to participate in the 4(f) determination. The basis of this argument is a letter sent by Leon A. Eplan, Commissioner of Budget and Planning for the City of Atlanta, to William Coleman, the Secretary of Transportation, dated November 21, 1975. In this letter Commissioner Eplan requested that the City have an input into, and a chance to review, the 4(f) statement being prepared by the Administrator for the MARTA project. This letter was written after the 4(f) statement had been approved on November 18, 1975, and the failure of the Administrator to respond to the letter until January 19, 1976 does not constitute a failure on his part to consider the views of the City.

The record is replete with communication between UMTA, MARTA, and City officials. In particular, John Wright, Chairman of the MARTA project, wrote Commissioner Eplan on February 14, 1975 and requested that he review the proposals for the Moreland Avenue Station and respond for the City. On March 12, 1975 Commissioner Eplan wrote Mr. Wright and sent out in a six-page letter the concerns and recommendations of the City as to the design of the Moreland Avenue Station and adjacent properties. In addition, the Court finds, after a review of the documentary evidence that there is only one conclusion to which the Court can come. Defendants at every step of the process have encouraged input from both the City of Atlanta and plaintiffs. The 4(f) statement with respect to Inman Park is procedurally sufficient.

It is true that the November 18th letter from Commissioner Eplan did not receive a timely response from UMTA officials. However a decision at some point in time must be made. All concerned parties were well aware that UMTA was actively undertaking to comply with the 4(f) requirements. Once the appropriate officials have allowed interested parties an input, the decision is for the federal officials to make, and the Court can find no requirement in the Act that a draft 4(f) statement be circulated for review by all interested parties.

Inman Park also contests the substantive decision made by the Administrator that there exists no feasible or prudent alterna-

128

tive to the proposed action. Inman Park contends that there is nothing in the administrative record which supports the conclusions drawn by the Administrator and contends that he did not consider the alternative of not building the Moreland Avenue Station.

In this regard it is interesting to note that the facts of this action are unique in a way from other litigation under 4(f). In *Overton Park* and its progeny the main concern was with the actual physical taking of park land for the construction of a highway. In the instant case, the Inman Park plaintiffs do not appear as concerned with the physical taking of a part of the historic area,[3] as with the effect that the station will have on the future of the area. The only taking of buildings within the historic district is due to the building of the East Line of MARTA, and the property will be taken whether or not the Moreland Avenue Station is ever built. Thus the question arises as to whether or not the building of the Moreland Avenue Station is a taking or use of historic property which even triggers the provisions of Section 4(f). It is, however, not necessary for the Court to resolve this issue. Given the scope of review available to the Court over the substantive decision of the administrative officials, the Court cannot conclude that the Administrator abused his discretion in finding that there are no feasible or prudent alternatives.

The East Line of MARTA runs from downtown Atlanta to a point beyond Avondale Estates. As noted in the previous order, any shifting of the tracks in one area can cause wide repercussions over the entire length of the East Line. The opinion of the Administrator has been well considered; it is based upon the entire administrative record, and, by necessity, all available engi-

neering data accumulated in the many years that MARTA has been in the planning stages. The Court will not and cannot substitute its judgment for that of UMTA. An alternative may appear to be feasible or prudent when viewed in the isolation of the Inman Park area, and yet be totally unworkable when viewed with the other components of the East Line. Unlike a highway system which is relatively flexible, and in which small components may be altered without damaging the end product or purpose, alternatives to particular segments of this rapid transit project must be compatible over the entire rail line.

These are issues addressed to the Administrator. The Court finds his conclusions based upon proper procedure and the consideration of proper factual input.

There is no abuse of the Administrator's discretion shown in the record in his determination that all possible planning has been instituted to minimize harm to the Inman Park area.[4]

### 2. DeKalb County Courthouse and the Sycamore Street 4(f) Statement

Plaintiff SOS questions the validity of the DeKalb County Courthouse and Sycamore Street 4(f) Statement on the substantive grounds that the Administrator could have found both feasible and prudent alternatives to the proposed action. In the statement the Administrator considered numerous alternatives, including alternatives proposed by SOS and related persons, and found each one to be either not feasible, as that word is defined in *Overton Park*, or fraught with unique problems.

The predominant alternative which SOS urges is the return to the railroad alignment that had been originally proposed. This alignment would entirely by-pass the

3. While the buildings which are to be taken because of the relocation of DeKalb Avenue are geographically located within the Inman Park historic area, they appear to have no historic significance in and of themselves.

4. In this regard the 106 agreement signed by defendants is especially significant. Defendants have agreed, inter alia, to submit the de-

sign of the Moreland Avenue Station to the Georgia State Historic Preservation Officer for review and this officer will solicit the opinion of Inman Park residents. In addition, defendants agreed that the traffic pattern around Inman Park would be responsive to citizen suggestions.

downtown area of Decatur. It would not pass through any designated property.[5] It is clear that it would be engineeringly feasible, and, in addition, that it would be cheaper to build than the present alignment. It had been rejected, even before the 1971 referendum which approved the funding of MARTA, because the railroad alignment did not achieve the major purpose of MARTA in the Decatur area. This purpose is to provide rapid transit to the downtown Decatur business district where it will serve as the focal point of a regional retail and office center for DeKalb County. If the alternative is one not able to serve the transportation goals and objectives of MARTA in the City of Decatur it poses a unique problem. Certainly the Court cannot say that the Administrator has abused its discretion in rejecting this alternative. To do so would amount to a holding that this Court can review a proposed transit system planned for the provisions of one service and convert it into a different system for the provision of completely different service.

In reviewing the other alternatives rejected in the 4(f) Statement, it appears to the Court that the Administrator has carefully considered the impact of each of these alternatives and SOS has not presented any argument upon which the Court could make a finding that he has not carried out his statutory duty.

There is no question but that the present alignment will destroy a number of old houses along Sycamore Street that are eligible for inclusion on the list of historic sites. The record shows, however, that since the institution of this litigation, MARTA and UMTA have worked with a number of historic groups and the citizens of the area to conclude arrangements significantly reducing the impact of MARTA on the

neighborhood as compared to the original MARTA proposal.[6]

## B) SECTION 14(c) DETERMINATIONS

Section 14 of the Urban Mass Transportation Act, although originally enacted by Congress in 1964, has not been the subject of any reported cases. It provides:

(a) It is hereby declared to be the national policy that special effort shall be made to preserve the natural beauty of the countryside, public park and recreation lands, wildlife and waterfowl refuges, and important historical and cultural assets, in the planning, designing, and construction of urban mass transportation projects for which Federal assistance is provided pursuant to section 1602 of this title. In implementing this policy the Secretary shall cooperate and consult with the Secretaries of Agriculture, Health, Education, and Welfare, Housing and Urban Development, and Interior, and with the Council on Environmental Quality with regard to each project that may have a substantial impact on the environment.

(b) The Secretary shall review each transcript of hearing submitted pursuant to section 1602(d) of this title to assure that an adequate opportunity was afforded for the presentation of views by all parties with a significant economic, social, or environmental interest, and that the project application includes a detailed statement on—

(1) the environmental impact of the proposed project,

(2) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(3) alternatives to the proposed project and

5. There is evidence, however, that this alignment would have an adverse impact on the campus of Agnes Scott College. The campus of Agnes Scott is a tranquil location just outside of the business district of Decatur which may itself be eligible for inclusion on the National Register of Historic Places.

6. Again, in fulfilling this requirement of 4(f), the agreement entered into by defendants pursuant to Section 106 is enlightening. The 106 agreement contains numerous specific steps which defendants will undertake to reduce the impact of MARTA on both the Courthouse and Sycamore Street.

(4) any irreversible and irretrievable impact on the environment which may be involved in the proposed project should it be implemented.

(c) The Secretary shall not approve any application for assistance under section 1602 of this title unless he finds in writing, after a full and complete review of the application and of any hearings held before the State or local public agency pursuant to section 1602(d) of this title, that (1) adequate opportunity was afforded for the presentation of views by all parties with a significant economic, social, or environmental interest, and fair consideration has been given to the preservation and enhancement of the environment and to the interest of the community in which the project is located, and (2) either no adverse environmental effect is likely to result from such project, or there exists no feasible and prudent alternative to such effect and all reasonable steps have been taken to minimize such effect. In any case in which a hearing has not been held before the State or local agency pursuant to section 1602(d) of this title, or in which the Secretary determines that the record of hearings before the State or local public agency is inadequate to permit him to make the findings required under the preceding sentence, he shall conduct hearings, after giving adequate notice to interested persons, in any environmental issues raised by such application. Findings of the Secretary under this subsection shall be made a matter of public record. 49 U.S.C. § 1610.

Section 14 is a combination of the requirements already imposed upon the federal defendants under Section 4(f) of the Department of Transportation Act and NEPA. While subsection (a) notes the important policy of protecting park and recreation lands and historic and cultural assets, subsection (b), which implements the policy, is written in broad terms which almost exactly track the provisions of Section 102(C) of NEPA. 42 U.S.C. § 4332(C). This subsection requires the same type of studies as are required by NEPA. 14(c), however, goes one step further then NEPA and requires the federal defendants to issue a statement similar to the statement required by 4(f).[7]

Plaintiffs do not attack the procedures used by defendants in satisfying the 14(c) requirements except in the argument of Inman Park, in conjunction with 4(f), that the City of Atlanta was not granted an input into the determination. Plaintiffs, in fact, use the same grounds of attack on the 14(c) determination as they mounted on the 4(f) determination. It appears that all of the parties treat the two statutes as being co-extensive and that the determinations would rise or fall together.

Although the standard of review under 14(c) has never been defined, the Court finds no reason not to apply the rules set out by the Supreme Court in *Overton Park* to the review of agency actions under 14(c). The same policy considerations apply to both statutes and the Court finds nothing in the substantive decision of the Administrator, when viewed in conjunction with the 4(f) and 106 determinations and the entire administrative record, which would warrant this Court overturning that decision.

### III. CONCLUSION

In conclusion, the Court finds no grounds on which to grant the relief requested by plaintiffs. Plaintiffs' request for declaratory and injunctive relief based upon Section 4(f) of the Department of Transportation Act, Section 14(c) of the Urban Mass Transportation Act, and Section 106 of the National Historic Preservation Act is DENIED.

This order concludes all issues raised in the litigation and the Clerk is directed to enter judgment in favor of defendants.

SO ORDERED, this 12th day of March, 1976.

---

**7.** One difference is that whereas 4(f) requires the federal defendants to include in any program all "possible" planning to minimize harm, 14(c) only requires all "reasonable" steps taken to minimize harm.